THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RICHARD MALIZIA, Appellant.

First Department, March 8, 1983

**APPEARANCES OF COUNSEL**

*Alan M. Dershowitz* of counsel (*Nathan Z. Dershowitz* with him on the brief; *Frank A. Lopez,* attorney), for appellant.

*Bruce Allen* of counsel (*Norman Barclay* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

OPINION OF THE COURT

SANDLER, J.

The defendant was convicted after a jury trial of two counts of murder in the second degree (common-law and felony murder), attempted murder in the second degree and assault in the first degree, and was sentenced to two concurrent terms of 25 years to life, and also to two concurrent terms of 8⅓ to 25 years and 5 to 15 years, to be served consecutively to the life sentence.

Of the several issues presented on this appeal, the one that seems to us to merit extended analysis is raised by the contention that reversible error occurred when the trial court admitted into evidence a statement of the deceased on the evening of the homicide that he was going to see the defendant. This testimony was admitted by the trial court under the state of mind exception to the hearsay rule pursuant to principles that derive from the well-known decision of the United States Supreme Court in *Mutual Life Ins. Co. v Hillmon* (145 US 285). The governing principle allows, under appropriate circumstances, declarations of intention offered to show subsequent acts of declarant where the acts are relevant to a trial issue. The declarant's statement is permitted to show his existing intent, and from this intent the trier of fact is permitted to infer that the act was carried out.

Recognizing that the application of this principle in criminal cases to permit an inference with regard to an event that involves the conduct or co-operation of a person other than the declarant has been the subject of scholarly and judicial disagreement, that the issue has not previously been authoritatively addressed in this State, and that some scholarly opinion is opposed to such an application of the state of mind exception, we are nonetheless persuaded that the testimony in question was here properly admitted under the circumstances presented. We are also persuaded that if the admission of this testimony were error, the error would have been harmless since, wholly

apart from the challenged statement, the totality of the evidence inescapably leads to the conclusion that the deceased had in fact intended to meet the defendant, and indeed did so.

The deceased, William Terrell, was a major drug dealer. His brother, Harry Terrell, the principal People's witness, was also a major drug dealer who worked from time to time in the deceased's drug selling operation. Sometime on the evening of December 18, 1978, at the apartment of the deceased's girlfriend, Brenda Beasley, also a witness for the People, the deceased asked his brother to go with him to meet Richy at 12 o'clock at the Pathmark. The deceased said that he had received some money from people who wanted to make a drug purchase, that he was going to see if Richy had any drugs, and that he also owed Richy some money and wanted to pay him. Harry Terrell understood the name Richy to be a reference to defendant, whom he knew as Richy Pontiac, and whom he had met on a number of occasions in the preceding two months, usually in the company of the deceased, and on several occasions near the Pathmark store located on 206th Street between Ninth and Tenth Avenue.

Shortly before midnight the two men left for the Pathmark in a car driven by Harry. In the car was a shoulder bag which contained bundles of money. The deceased told Harry that the bag contained the money that he owed the defendant. Harry drove to the intersection of Tenth Avenue and 206th Street, a two-way street, parking on the south side of 206th Street facing Ninth Avenue. The deceased left the vehicle with the bag and walked down the block to a blue Ford parked on the north side of the street near the corner of Ninth Avenue. Harry recognized the car as one that he had seen the defendant use on all but one of the prior occasions on which he had seen the defendant. The license plates disclosed it to be a rental car. The deceased entered the front of the blue Ford, emerging a few moments later without the bag, and told his brother to return to the Beasley apartment to secure more money.

Harry returned to the Beasley apartment and received from her another bag in which he again observed bundles of money. At 206th Street Harry parked his car in the same

spot. The deceased appeared moments later, took the new bag, returned to the blue Ford and entered it.

Suddenly the Ford took off at a rapid pace, headlights off, in the direction of the car in which Harry was waiting. He heard a burst of noise, which sounded like firecrackers. As the car reached Harry's car he saw the defendant in the middle of the back seat pointing a gun directly at him. Harry dropped immediately to the floor as a burst of gunfire knocked out the windows of his car. In addition to the defendant, Harry also saw the driver, who like the defendant, was a white man.

In the early morning of December 19, 1978, a State trooper found the dead body of the deceased on the side of a northbound lane of the New York State Thruway, a series of bullet holes running from his back to his head. No bullets or bullet fragments were observed in the surrounding area.

The medical examiner testified that the deceased had died of multiple bullet wounds. Nine bullets had entered his body almost simultaneously, all from the back, and eight of them had traveled on a left-to-right track. An expert witness testified that the upward swing of the line of fire indicated that a single semiautomatic weapon had inflicted the wounds in a matter of seconds. An examination of the deceased's hat and coat disclosed 17 bullet holes, seven with gunshot residue around them, indicating that the gun had been fired 8 to 12 inches from the holes.

From evidence found at the location of the car occupied by Harry Terrell on 206th Street, it was determined that 13 bullets had been fired at the driver's side of the car, that nine had pierced the frame, that the path of the bullets suggested that they had been fired from a moving car, and that at least two automatic or semiautomatic weapons had been used in that attack.

At about 5:00 P.M. on December 19 the defendant and his brother, John Malizia, went to a Ford dealership in Spring Valley, New York, where they told the rental manager that a car rented by John over a period of several months, a 1979 blue Ford Granada, had been stolen the previous day. The two brothers explained that they had not reported the

larceny of the car because each had thought that the other had the car. The police were unable to find the car.

Brenda Beasley testified that she had spoken on the telephone on several occasions to someone who had identified himself as Richy in the weeks prior to the homicide. She had twice accompanied the deceased to the area of the Pathmark. On each occasion the deceased had left her and had entered a rented blue Ford car. On one occasion, leaving the scene of the meeting, she had observed the defendant in the car.

In addition, there was testimony that the portion of the New York State Thruway where the body of the deceased was found was along the route that would be taken by a car proceeding from 206th Street to Monsey, New York, where the defendant's brother resided.

By any standard the evidence here summarized impressively and convincingly supported in every respect the jury's verdict. We find wholly without merit the defendant's contention that the proof was insufficient because no one had observed the defendant actually shooting the deceased. The defendant was seen within seconds after a burst of gunfire had killed the deceased, gun in hand, about to undertake the murder of Harry Terrell. He was identified by someone who had met him on a number of occasions and had no discernible reason to lie with regard to the identity of the person who had killed his brother and who had attempted to kill him. The identification was supported by a host of circumstances which inexorably point to the defendant as a participant in the murder and attempted murder.

It is of no moment whether the defendant himself killed the deceased or the killing was done by someone obviously his accomplice, although the evidence strongly points to the defendant as the actual killer. Nor do we find any infirmity in the evidence supporting defendant's conviction of felony murder. Although the killing may have been motivated by other, unknown considerations, the manner in which it was carried out strongly supports the jury's implicit conclusion that the taking of the money was no mere afterthought.

■ Turning to the principal issue presented on this appeal, defendant's challenge to the admissibility of the deceased's statement that he was going to see the defendant invites our consideration of an issue that has divided both scholarly and judicial opinion since the central principles of the pertinent hearsay exception were set forth by the Supreme Court in *Mutual Life Ins. Co. v Hillmon* (*supra*). The principle is of course now universally accepted that under appropriate circumstances a declarant's statement of intent to perform an act may be admissible as evidence that he performed the act where the act is relevant to an issue in the case. (See Maguire, The Hillmon Case — Thirty-Three Years After, 38 Harv L Rev 709; but see Seligman, An Exception to the Hearsay Rule, 26 Harv L Rev 146.) Controversy has developed over the admissibility of such a statement where the inference sought to be drawn implies some conduct on the part of one other than the declarant or to some extent requires that person's co-operation. (See McCormick, Evidence [2d ed], § 295.) Most commonly the issue has been addressed in the context of criminal trials in which a deceased declarant's statement of intent to see or meet a defendant is sought to be admitted as evidence that such a meeting in fact took place.

In the *Hillmon* case itself, an action to recover on a life insurance policy, the Supreme Court sustained the admissibility of a declarant's statement that he was going to be with another person for a period of time as evidence that such an event in fact took place. A large majority of the courts which have considered essentially that issue in criminal cases followed *Hillmon* in sustaining admissibility. (See 6 Wigmore, Evidence [Chadbourn rev, 1976], § 1725, n 1, including a detailed listing of the relevant decisions.) However, relatively few decisions have undertaken a systematic analysis of the problem, and these few disclose a division of judicial opinion. (Compare *United States v Pheaster,* 544 F2d 353, and *People v Alcalde,* 24 Cal 2d 177 [both sustaining admissibility], with *Clark v United States,* 412 A2d 21 [DC App] [denying admissibility]; see, also, *Shepard v United States,* 290 US 96, 105; *United States v Cohen,* 631 F2d 1223, 1225.)

In *United States v Pheaster (supra)* which sustained the admissibility of a deceased declarant's statement of intent to meet the defendant, the court set forth with scrupulous fairness the arguments that had been advanced in opposition to the result it reached. Two such arguments were noted.

The first is based on the supposed unreliability of an inference which implies conduct on the part of one other than declarant. The court in *Pheaster (supra)* concluded, correctly in our view, that this objection was not compelling, observing that where the inference in question requires the co-operation of another person, the contingency added is one of degree rather than of kind, and merely goes to the weight of the evidence.

The second objection was perceived in the apparent inconsistency with the state of mind exception of an inference relating to the conduct of another person, the inference conceptually implying, in addition to the declarant's state of mind, a conclusion with regard to the state of mind of the third person. Recognizing the theoretical awkwardness of this application of the state of mind exception, the court nonetheless sustained the admissibility of the statement, relying on the analysis set forth in *Hillmon (supra)* itself and the weight of existing judicial authority.

We are persuaded that a statement by a deceased that he intends to meet another is admissible where the statement is made under circumstances that make it probable that the expressed intent was a serious one, and that it was realistically likely that such a meeting would in fact take place. (See *People v Alcalde, supra,* at pp 187-188.) The conceptual difficulty noted in *Pheaster (supra)* seems to us to obscure the commonsense reality of the problem presented. Everyday experience confirms that people frequently express an intent to see another under circumstances that make it extremely likely that such a meeting will occur. Indeed, it is not uncommon for such expressions of intent to be more trustworthy evidence that the meeting took place than many statements of intent with regard to the performance of acts not involving any inference with regard to another person.

This was the very analysis that led the United States Supreme Court in *Hillmon* (*supra*) to find admissible a statement of intent to be with another person as evidence that such an event occurred. And although *Hillmon* itself was a civil case, it is not without significance that the Supreme Court quoted extensively, and with approval, from a decision in a criminal case involving precisely the same kind of inference at issue here which sustained admissibility on the basis of the probative trustworthiness of the evidence. (*Hunter v State,* 11 Vroom [40 NJL] 495, 534, 536, 538.)

The facts in this case are illustrative. The deceased was a major drug dealer who, over a period of several months prior to the day of the homicide, had seen the defendant on a number of occasions. Several meetings had taken place in the precise location to which he and his brother went on the evening he was killed. The deceased told his brother, an associate in his narcotics business, that he owed money to the defendant and that he wished to pay him. That the deceased in fact intended to see the defendant is convincingly confirmed by the circumstance that he asked his brother to accompany him. That the deceased in fact owed money to the defendant, which he intended to pay, was confirmed by the presence in the car of a bag containing bundles of money which he took with him when he went to enter the blue Ford. Experience suggests that someone who wishes to pay a large sum of money to another with whom he has been meeting on a regular basis over a period of time is not likely to encounter insuperable difficulties in the way of paying the debt. In short, the challenged statement seems to us to have been properly admissible in light of the totality of the circumstances which confirm that the expressed intent to meet the defendant was a serious one, and that it was likely that such a meeting would in fact take place.

Even if we had determined that the statement was erroneously admitted, it would seem to us that the error would have been harmless indeed under all the circumstances. Deleting from the trial evidence the statement that the deceased was going to meet the defendant, the inference from the rest of the evidence that he expected to

meet the defendant, and did so, is all but inescapable. The prior meetings of the deceased and the defendant in the neighborhood of the Pathmark, his acknowledgment of a debt to the defendant, the bag with the bundles of money, the rented blue Ford waiting in the area of the store, the taking of the bag of money, entering the blue Ford as he had on prior occasions when the defendant was in the car — all of these factors taken together would have made it unmistakably clear to the jury that the deceased expected to see the defendant.

■ As to the other trial errors alleged by the defendant, we agree that it was an error to have permitted questions with regard to Harry Terrell's assumption of family obligations, questions apparently intended to make the witness appear more sympathetic than would otherwise have been the case. Under the circumstances, including particularly the witness' detailed testimony that he had been actively engaged in the narcotics trade for many years, the error was clearly harmless.

■ We also think that the trial court erred in precluding cross-examination intended to elicit that the witness had received a promise of favorable consideration from another prosecutor's office in connection with his co-operation in a separate case. Although the arrangements sought to be brought out did not directly involve the testimony of the witness in this case, it would have been wiser to have permitted the area to have been explored by defense counsel. This error, too, seems to us to have been harmless. This was not a case in which the witness confirmed a prior police suspicion as to the identity of a killer under circumstances indicating that he was seeking favorable treatment for himself in exchange for his information. It was the witness who first identified defendant as the killer, and a realistic evaluation of the record discloses no reason why he would have falsely identified the defendant as the one who killed his brother and attempted to kill him.

Accordingly, the judgment of the Supreme Court, New York County (FITZER, J.), rendered February 11, 1981, convicting defendant after a jury trial of two counts of murder in the second degree, attempted murder in the second degree and assault in the first degree, and sentenc-

ing him to two concurrent terms of 25 years to life, and two concurrent terms of 8⅓ to 25 years and 5 to 15 years, to be served consecutively to the life sentence, should be affirmed.

CARRO, LYNCH and MILONAS, JJ., concur.

Judgment, Supreme Court, New York County, rendered on February 11, 1981, unanimously affirmed.