[No. 50637–0. En Banc. March 13, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. JAMES R. TERROVONA, *Appellant.*

*James R. Terrovona,* pro se, and *Mark D. Mestel,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Seth Aaron Fine, Deputy,* for respondent.

ANDERSEN, J.—

## FACTS OF CASE

At issue in this case is the admissibility of much of the State's evidence against the defendant, James R. Terrovona, who is appealing his conviction for the first degree murder of his stepfather, Gene Patton.

At about 8:15 p.m. on February 26, 1984, the decedent, Gene Patton, received a telephone call at his home. He told his girl friend that the phone call was from the defendant. He said that the defendant had apparently run out of gas on 116th in Marysville and wanted his (the decedent's) assistance. The decedent also said that he (the decedent) must be crazy, but left for the avowed purpose of helping the defendant.

At about 8:30 p.m., a passerby found a body lying alongside a car on 116th Street. Shortly after 9 p.m. Snohomish County deputies identified the deceased. He had been severely beaten and shot. The subsequent autopsy revealed that the cause of death was gunshots to the head and abdomen. A gasoline can was near the decedent's car. Deputies also observed what appeared to be a fairly recent tire tread impression on the shoulder of the road just in front of

the car; they concluded that the tread was not from the decedent's car and took a plaster cast of the impression.

At approximately 9:15 p.m., a lieutenant from the Snohomish County Sheriff's Office arrived on the scene and suggested the defendant as a suspect. It was "common knowledge" at the precinct that there was bad blood between the decedent and the defendant and that the defendant had once threatened the decedent. Sometime after 10 p.m., this lieutenant learned that the defendant lived at 1305 Casino Road in Everett and drove a 1975 Ford Elite automobile.

At about 10:30 p.m., police officers informed the decedent's girl friend of his death. She told the officers of the phone call the decedent had received just before he left that night, and what he had said about it.

At approximately 1 a.m., several police officers arrived at an apartment building at 1305 Casino Road. A Ford Elite was in the parking lot. A deputy looked at the car's tires and concluded that the right front tire tread closely matched the impression left on the shoulder of 116th. The manager told the deputies where the defendant lived, and four of them went to his apartment; they had no arrest warrant.

As soon as the defendant opened his door, the deputies arrested and handcuffed him and took him into the apartment. Then they quickly checked the apartment for other people or weapons and found nothing. After having been given his *Miranda* warnings, the defendant indicated that he understood them and made some incriminating statements.

A couple of officers remained in the apartment until another detective obtained a search warrant. Upon his return, detectives seized several items of evidence expressly referred to in the warrant. They also seized grocery store receipts not mentioned in the search warrant.

After defendant's arrest, the police impounded his car without a warrant, but later obtained a warrant to search the car.

The defendant was charged with first degree murder. When the trial began on May 7, the defendant moved to suppress the physical evidence seized from his apartment and the car, and also moved to suppress the custodial statements he had made in the apartment. The court denied these motions, and also declined to suppress testimony of the defendant's parole officer about the defendant's request for a gun permit and his reasons therefor (the defendant had earlier been convicted of social security fraud). The court also denied the defendant's motion to suppress the girl friend's testimony about the phone call the decedent received the evening of his death.

The State presented most of this evidence in its case in chief. When friends of the defendant testified in the defense case that he had spent the evening of February 26 in a tavern, the State introduced the store receipts as rebuttal evidence to show that the defendant was in a grocery store at 10:15 p.m.

The jury found the defendant guilty of first degree murder and he was sentenced to life imprisonment. He appealed his conviction directly to this court and we accepted review.

Seven principal issues are presented.

## ISSUES

ISSUE ONE. Did the trial court err in admitting hearsay evidence of the statements the decedent made as he left home to meet his death?

ISSUE TWO. Was the defendant's arrest unlawful because it was made without an arrest warrant?

ISSUE THREE. Was it error to admit evidence seized from the defendant's apartment because the police secured the apartment from within while awaiting a search warrant?

ISSUE FOUR. Did the trial court err in admitting custodial statements made by the defendant into evidence?

ISSUE FIVE. Did the trial court err in admitting evidence concerning the defendant's automobile?

ISSUE SIX. Did the trial court err in admitting the store

receipts in evidence because they were not included within the stated scope of the search warrant?

ISSUE SEVEN. Did the trial court err in admitting evidence showing that the defendant was on federal probation?

## DECISION

ISSUE ONE.

CONCLUSION. Under ER 803(a)(3), the decedent's statements to his girl friend were admissible in evidence because they evinced his then state of mind.

A statement made out of court that is offered in court to prove the truth of the matter stated is inadmissible hearsay evidence unless it falls within one of the exceptions to the hearsay rule.[1] One exception to the hearsay rule allows evidence of a declarant's state of mind. This is ER 803(a)(3) which reads:

> *Then Existing Mental, Emotional, or Physical Condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

This rule is in accord with previous Washington law providing that statements of a declarant's then existing state of mind are admissible in evidence if there is need for their use and if there is substantial probability of their trustworthiness.[2]

Fed. R. Evid. 803(3) is the same as ER 803(a)(3). Under both rules, hearsay evidence is admissible if it bears on the declarant's state of mind and if that state of mind is an issue in the case.[3] Under the federal rule, the state of mind

---

[1]*See* ER 801; ER 802; *see also In re Penelope B.,* 104 Wn.2d 643, 651, 709 P.2d 1185 (1985).

[2]Comment, ER 803(a)(3), 91 Wn.2d at 1165.

[3]*United States v. Pheaster,* 544 F.2d 353, 376 (9th Cir. 1976), *cert. denied,* 429 U.S. 1099 (1977); *State v. Parr,* 93 Wn.2d 95, 98–99, 606 P.2d 263 (1980).

exception has also been held to authorize admission of evidence of a party's intentions as circumstantial evidence that he acted according to those intentions. This extension of the state of mind exception is known as the "*Hillmon* doctrine."[4]

Long before the present evidentiary rules were adopted, the United States Supreme Court examined the state of mind rule in *Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285, 36 L. Ed. 706, 12 S. Ct. 909 (1892). The issue in *Hillmon* was the identity of a body found at a campsite. The plaintiffs in that case contended that the body was that of a Mr. Hillmon. The defendants contended the body was that of a Mr. Walters and sought to introduce letters Walters had written stating that he intended to go to the area of the campsite with Hillmon. The Supreme Court found the letters admissible for two purposes:

> The letters in question were competent, . . . as evidence that, . . . [Walters] had the intention of going, and of going with Hillmon, which made it more probable both that he did go and that he went with Hillmon, than if there had been no proof of such intention.

*Hillmon,* at 295–96.

Although *Hillmon* was a civil case, the Court cited with approval a number of criminal cases in support of its decision.

One such case was *Hunter v. State,* 40 N.J.L. 495 (1878). In that case, Hunter was indicted for the murder of Armstrong. At issue was the admissibility of Armstrong's letters and statements, conveyed to his wife and son on the date of his death, to the effect that he was going on a business trip with Hunter. The Court quoted as follows from *Hunter,* at 538:

> "In the ordinary course of things, it was the usual information that a man about leaving home would communicate, for the convenience of his family, . . . At the time it was given, such declarations could . . . mean harm to no

---

[4]*Pheaster,* at 376; *United States v. Stanchich,* 550 F.2d 1294, 1297 n.1 (2d Cir. 1977).

one; . . . If it is legitimate to show by a man's own declarations that he left his home to be gone a week, or for a certain destination, which seems incontestable, why may it not be proved in the same way that a designated person was to bear him company? . . . If it was in the ordinary train of events for this man to leave word or to state where he was going, it seems to me it was equally so for him to say with whom he was going."

*Hillmon,* at 299. A similar fact pattern, and much the same analysis, is found in *State v. Vestal,* 278 N.C. 561, 180 S.E.2d 755 (1971).

Under *Hillmon,* therefore, a declarant's statement of future intent is admissible to prove: (1) that the declarant went to the place indicated by his or her statement of intention, and (2) that the declarant went there with the other named party.[5]

Most courts have expanded the "*Hillmon* doctrine" to admit hearsay statements of intent that implicate a third party's conduct.[6] This expansion is commonly used in murder trials, where courts admit a decedent's hearsay statements that implicate the defendant in the murder.[7] Courts use such evidence despite conflicting guidance in the comments to Fed. R. Evid. 803(3). That rule itself makes no reference to *Hillmon,* but the comments contain this statement by the Advisory Committee: "'The rule of Mutual Life Ins. Co. v. Hillmon . . ., allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed'".[8] Following this observation is

---

[5]*Clark v. United States,* 412 A.2d 21, 29 (D.C. 1980); *see also United States v. Astorga–Torres,* 682 F.2d 1331, 1335–36 (9th Cir.), *cert. denied,* 459 U.S. 1040, 74 L. Ed. 2d 608, 103 S. Ct. 455 (1982); *State v. Abernathy,* 265 Ark. 218, 222, 577 S.W.2d 591 (1979).

[6]*See* Note, *Federal Rule of Evidence 803(3) and the Criminal Defendant: The Limits of the Hillmon Doctrine,* 35 Vand. L. Rev. 659, 683 (1982); *see also Astorga–Torres,* at 1335–36; *Stanchich,* at 1297 n.1.

[7]Note, 35 Vand. L. Rev. at 686; *see also Abernathy; Commonwealth v. Marshall,* 287 Pa. 512, 135 A. 301 (1926).

[8]Note, 35 Vand. L. Rev. at 681.

one from the House Judiciary Committee: "'the Committee intends that the Rule be construed to limit the doctrine of [*Hillmon*], so as to render statements of intent by a declarant admissible only to prove *his* future conduct, not the future conduct of another person.'"[9]

Neither the text of ER 803(a)(3) nor the comments thereto mention *Hillmon.* One commentator in this state concludes that the history of rule 803(a)(3) indicates an intent to follow the House Committee's view.[10] No Washington cases are cited as direct support for this observation, and the commentator acknowledges that some courts have extended the rule to allow the admission of a statement as proof of the joint conduct of the declarant and another.[11]

The defendant argues that under *State v. Parr,* 93 Wn.2d 95, 606 P.2d 263 (1980), the decedent's statements as to the defendant's phone call to him are inadmissible to show that the defendant met the decedent on 116th Street. At issue in *Parr* was the admissibility of a decedent's statements that she feared Parr and that he once threatened her. This evidence was introduced to rebut a claim that the defendant accidentally shot the victim in self–defense.[12] We observed there that the inference to be drawn from such testimony was that the defendant wanted to and did kill the victim and was unduly prejudicial. *Parr* held that ER 803(a)(3) "permits statements reporting the declarant's state of mind, but does not permit statements reporting the conduct of another which might have induced that state of mind."[13]

*Parr* is distinguishable from the case before us. Here, the decedent's statements concerning his intention to take a

---

[9]Note, 35 Vand. L. Rev. at 681–82.

[10]*See* 5A K. Tegland, Wash. Prac. § 366, at 223 (2d ed. 1982).

[11]K. Tegland, § 366.

[12]*Parr,* at 98.

[13]*Parr,* at 104 n.1.

certain action shortly before he was killed necessarily implicated the defendant's future conduct. The decedent said that because the defendant had called him, he (the decedent) was going to meet the defendant on 116th Street. Unlike *Parr,* the State is not relying on past incidents to prove the defendant's subsequent conduct.[14]

The Ninth Circuit recognized that state of mind evidence used to prove subsequent conduct of the declarant and a third party is not foolproof, but concluded that any unreliability goes to the weight of the evidence rather than to its admissibility.

> Even where no actions by other parties are necessary in order for the intended act to be performed, a myriad of contingencies could intervene to frustrate the fulfillment of the intention. The fact that the cooperation of another party is necessary if the intended act is to be performed adds another important contingency, but the difference is one of degree rather than kind. The possible unreliability of the inference to be drawn from the present intention is a matter going to the weight of the evidence which might be argued to the trier of fact, but it should not be a ground for completely excluding the admittedly relevant evidence.

*United States v. Pheaster,* 544 F.2d 353, 376 n.14 (9th Cir. 1976), *cert. denied,* 429 U.S. 1099 (1977).[15] We agree.

One New York court has found a greater degree of reliability in using *Hillmon* evidence to prove the conduct of a third person.

> Everyday experience confirms that people frequently express an intent to see another under circumstances that make it extremely likely that such a meeting will occur. Indeed, it is not uncommon for such expressions of intent to be more trustworthy evidence that the meeting took place than many statements of intent with regard to the performance of acts not involving any inference with regard to another person.

*People v. Malizia,* 92 A.D.2d 154, 160, 460 N.Y.S.2d 23, 27

---

[14]*See Penelope B.,* at 658; *Abernathy,* at 222.

[15]*See also Vestal,* at 588–89.

(1983), *aff'd,* 62 N.Y.2d 755, 465 N.E.2d 364, 476 N.Y.S.2d 825, *cert. denied,* 469 U.S. 932, 83 L. Ed. 2d 264, 105 S. Ct. 327 (1984).

■ The decedent's statements, made before leaving his house, about the phone call from the defendant and his intention to go help him, constituted the State's strongest evidence of the defendant's guilt. Neither this defendant's nor the decedent's states of mind were at issue in the trial. Under the "*Hillmon* doctrine", however, the decedent's intentions were admissible to infer that he acted according to those intentions, and that he acted with the person he mentioned. The conduct of the decedent and the defendant after the phone call was definitely at issue in the trial. The decedent's statements under the circumstances here created a trustworthy inference that the defendant met him on 116th Street where he was killed within a half hour of receiving the phone call and leaving his home. Those statements were properly admitted into evidence, the weight of such evidence being for the jury.

The defendant argues that even if admission of decedent's statements was proper, their use violated his constitutional right of confrontation. We disagree.

■ Both the state and federal constitutions guarantee a defendant in a criminal prosecution the right to confront those who testify against the defendant. U.S. Const. amend. 6; Const. art. 1, § 22 (amend. 10). The confrontation clause restricts the range of admissible hearsay in two ways.[16] The prosecution must demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant, and the proposed statement must bear adequate "indicia of reliability".[17] Reliability is inferred where the evidence falls within a recognized exception to the hearsay

---

[16]*State v. Parris,* 98 Wn.2d 140, 144–45, 654 P.2d 77 (1982); *State v. Barber,* 38 Wn. App. 758, 763, 689 P.2d 1099 (1984).

[17]*Parris,* at 145; *Barber,* at 763.

rule.[18]

In the present case, the declarant was unavailable to testify because he had been killed.[19] The state–of–mind exception to the hearsay rule is well established. Since the trial court did not err by concluding that the decedent's statements came within that exception, their use did not violate the defendant's right of confrontation.

ISSUE TWO.

CONCLUSION. The defendant's arrest was lawful. The police had probable cause to arrest him and exigent circumstances justified the warrantless arrest at his home.

■ Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in a belief that an offense has been committed.[20] Probable cause is not a technical inquiry.[21] A bare suspicion of criminal activity, however, will not give an officer probable cause to arrest.[22]

The trial court found that several factors contributed to a finding of probable cause to arrest the defendant. The police knew of bad feelings between the defendant and decedent; they were informed that the decedent had talked to the defendant on the telephone, then had gone out to 116th Street N.E. and 34th in Marysville to help him; they knew that within a half hour thereafter the decedent's bullet–riddled body was found at that location; and they knew

---

[18]*State v. Ryan,* 103 Wn.2d 165, 170, 691 P.2d 197 (1984); *Barber,* at 763.

[19]*See Vestal,* at 582.

[20]*State v. Gluck,* 83 Wn.2d 424, 426–27, 518 P.2d 703 (1974); *State v. Braun,* 11 Wn. App. 882, 884–85, 526 P.2d 1230 (1974).

[21]*State v. Bellows,* 72 Wn.2d 264, 266, 432 P.2d 654 (1967); *State v. Dorsey,* 40 Wn. App. 459, 468, 698 P.2d 1109 (1985).

[22]*Brinegar v. United States,* 338 U.S. 160, 175, 93 L. Ed. 1879, 69 S. Ct. 1302 (1949); *State v. Franklin,* 41 Wn. App. 409, 416, 704 P.2d 666 (1985).

that the front tire on the defendant's automobile had a "cupping" similar to the tire tread impression found near the body. These factors created more than a "bare suspicion" that the defendant had engaged in criminal activity; the police had probable cause to arrest him.

Whether the defendant was properly arrested without a warrant is a separate question. In *Payton v. New York,* 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980), it was held that the Fourth Amendment prohibits police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest without exigent circumstances. In *Payton,* the Court did not specify what those circumstances might be, but in *Welsh v. Wisconsin,* 466 U.S. 740, 80 L. Ed. 2d 732, 744, 104 S. Ct. 2091 (1984) pointed to *Dorman v. United States,* 435 F.2d 385 (D.C. Cir. 1970) as a leading case in defining exigencies.

*Dorman* enumerates six elements to aid in determining when a warrantless police entry into a home is justified: (1) a grave offense, particularly a crime of violence, is involved; (2) the suspect is reasonably believed to be armed; (3) there is reasonably trustworthy information that the suspect is guilty; (4) there is strong reason to believe that the suspect is on the premises; (5) the suspect is likely to escape if not swiftly apprehended; and (6) the entry is made peaceably. *Dorman,* at 392–93. These factors supplement the exigencies this court gathered from other federal cases in *State v. Counts,* 99 Wn.2d 54, 60, 659 P.2d 1087 (1983): (1) hot pursuit; (2) fleeing suspect; (3) danger to arresting officer or to the public; (4) mobility of the vehicle; and (5) mobility or destruction of the evidence.

In *State v. McIntyre,* 39 Wn. App. 1, 5, 691 P.2d 587 (1984), the Washington Court of Appeals found all of the *Dorman* elements satisfied. There, after a police officer had stopped McIntyre for a traffic violation, McIntyre fought with the officer, took his gun and threatened to kill him. The police traced McIntyre to his house and there arrested him without a warrant. Citing *Counts,* the Court of Appeals held that the danger McIntyre presented demonstrated

exigent circumstances justifying a warrantless search and seizure. *McIntyre,* at 5.

The police did not seek a warrant in this case but directly moved in and arrested the defendant. We conclude that the exigent circumstances which existed in this case justified the defendant's warrantless nighttime arrest in his apartment. The trial court observed that: the decedent's wallet with more than $100 in it was found on his body; he had been drawn to the scene and killed; it appeared to be a premeditated, not haphazard, homicide; there was a need to protect the public; and there was the distinct possibility of the defendant fleeing. All of the *Dorman* factors were present. We agree with the trial court's conclusion that exigent circumstances justifying entrance into the defendant's apartment existed and that the warrantless arrest was valid.

ISSUE THREE.

CONCLUSION. The trial court did not err in admitting evidence seized from the defendant's apartment with a search warrant because none of that evidence was discovered while the detectives waited for the search warrant.

In *State v. Bean,* 89 Wn.2d 467, 572 P.2d 1102 (1978), evidence obtained pursuant to a lawful search warrant after police officers unlawfully arrested a defendant and internally secured his home was suppressed. In *Bean,* unlike the present case, the initial entry and arrest was unlawful. In addition, the officers in that case had observed marijuana in plain view while securing the house and told the officer who obtained the search warrant of their discovery. *Bean,* at 470. Here, the initial warrantless entry and arrest of the defendant was justified by exigent circumstances. Furthermore, the officers observed nothing in the apartment that contributed to the search warrant, nor did they observe anything in plain view that was later used as evidence. The trial court found that the premises were just generally checked for armed third persons in the interests of police safety (it was not known if the defendant had an accomplice or not), but that there was no search past that.

No reversible error was committed in this regard.

ISSUE FOUR.

CONCLUSION. Although the defendant did not make a written waiver of his *Miranda*[23] rights, his custodial statements were made after he had impliedly waived his *Miranda* rights and, therefore, were properly admitted into evidence.

A suspect in a criminal case may waive his right to remain silent provided such waiver is made knowingly, voluntarily and intelligently.[24] If these elements are satisfied, comments a suspect makes are admissible as evidence.[25]

A valid waiver may be expressly made by a suspect or implied from the facts of a custodial interrogation. As held in *State v. Adams,* 76 Wn.2d 650, 671, 458 P.2d 558 (1969), *rev'd on other grounds,* 403 U.S. 947, 29 L. Ed. 2d 855, 91 S. Ct. 2273 (1971):

> The Supreme Court has not required an express statement by the accused for an effective waiver, but rather has forbidden the presumption that an intelligent waiver was made simply from the fact that a statement was eventually extricated from the accused after he was warned of his rights. Some additional showing is required that the inherently coercive atmosphere of custodial interrogation has not disabled the accused from making a free and rational choice.

Implied waiver has been found where the record reveals that a defendant understood his rights and volunteered information after reaching such understanding.[26] Waiver has also been inferred where the record shows that a

---

[23]*Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

[24]*Miranda,* at 444.

[25]*See Miranda,* at 444; *State v. Myers,* 86 Wn.2d 419, 425–27, 545 P.2d 538 (1976); *State v. Cashaw,* 4 Wn. App. 243, 251, 480 P.2d 528 (1971).

[26]*See State v. Gross,* 23 Wn. App. 319, 324, 597 P.2d 894 (1979); *State v. Adams,* 76 Wn.2d 650, 670, 458 P.2d 558 (1969), *rev'd on other grounds,* 403 U.S. 947, 29 L. Ed. 2d 855, 91 S. Ct. 2273 (1971).

defendant's answers were freely and voluntarily made without duress, promise or threat and with a full understanding of his constitutional rights.[27]

Here, although there was some confusion in the matter, the trial court found that the defendant was advised of his *Miranda* rights, understood them, then voluntarily waived them and participated in a discussion with the detectives. In that discussion, a detective said that "Gene" was dead and asked the defendant where he had been that evening. The defendant said he had been with friends and added that he objected to any search of his apartment. The defendant then also said he didn't shoot Gene, and when a detective said they had never said that Gene was shot, the defendant said he thought the police were looking for a gun. He then asked for an attorney and the interrogation ceased. Nothing in our review of the record shows that the defendant was coerced into making any statements while in custody. The facts sustain the trial court's finding of implied waiver.

ISSUE FIVE.

CONCLUSION. The trial court did not err in admitting evidence from the defendant's car because it was properly impounded as evidence of a crime.

■ A car may be lawfully impounded as evidence of a crime if an officer has probable cause to believe that it was stolen or used in the commission of a felony.[28] While the rule has been clearly stated, the requirements underlying it are not so clear.[29] We need not delve into the various theories applied by different courts in this situation, however, since under any view the officers had the right to impound the car.

When the police went to the apartment where the

---

[27]*Adams*, at 671; *Cashaw*, at 251.

[28]*State v. Simpson*, 95 Wn.2d 170, 189, 622 P.2d 1199 (1980); *State v. Reynoso*, 41 Wn. App. 113, 117, 702 P.2d 1222 (1985).

[29]*Simpson*, at 190 n.7.

defendant was believed to live, his automobile was found in plain view in a place where the officers had a right to be.[30] The right front tire appeared to match the tire tread impression found at the scene of the killing. The police also justified the impoundment on the grounds that it was raining and they did not want evidence of possible bloodstains and fingerprints washed from the car. While there was conflicting testimony about the rain, we agree with the trial judge that, because of the tire and the probability that the automobile was an instrumentality used in the homicide, it was properly impounded to preserve evidence.

ISSUE SIX.

CONCLUSION. The store receipts were found during a search of the defendant's apartment within the scope of the search warrant, and were properly seized when it was readily apparent they were evidence. The admission of the store receipts as rebuttal evidence was, therefore, not erroneous.

 Evidence not described in a warrant, and not constituting contraband or instrumentalities of crime, may be seized if it will aid in a particular apprehension or conviction, or if it has a sufficient nexus with the crime under investigation.[31]

The search warrant authorized a search of the defendant's apartment for, among other things, "firearms, ammunition, documents showing ownership of weapons and/or ammunition" etc. Grocery store receipts, however, were not among the items enumerated in the search warrant issued to search the defendant's apartment. The trial court admitted the receipts as evidence based on its holding that a search of the bag in which they were found was reasonable in light of what was being searched for. The police were authorized to search for firearms and ammunition,

---

[30]*See State v. Chrisman,* 100 Wn.2d 814, 819, 676 P.2d 419 (1984); *State v. Dresker,* 39 Wn. App. 136, 138, 692 P.2d 846 (1984).

[31]*See Warden v. Hayden,* 387 U.S. 294, 307, 18 L. Ed. 2d 782, 87 S. Ct. 1642 (1967); *State v. Turner,* 18 Wn. App. 727, 729, 571 P.2d 955 (1977), *cited with approval in State v. Reid,* 38 Wn. App. 203, 212, 687 P.2d 861 (1984).

and the paper bag in which they found the sales slips could have held either. The detectives also were authorized to search for documents showing ownership of weapons or ammunition. The receipts were "documents" and once they were found, the officers were entitled to read them to see if they were documents of the type listed in the search warrant. While the sales slips were not such documents, their seizure was permissible because their significance to the investigation was immediately apparent. The officers knew of the defendant's claimed alibi before the search, and when they read the receipts it was obvious that the slips could substantiate or undermine that alibi.

Issue Seven.

Conclusion. Evidence showing that the defendant was a federal probationer was, under the facts, admissible under ER 404(b).

 The admissibility of evidence of prior criminal conduct is covered by ER 404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Before evidence of prior crimes, wrongs or acts can be admitted pursuant to this rule, two criteria must be met: (1) the evidence must be shown to be legally relevant to a material issue before the jury; and (2) if the evidence is relevant, its probative value must be shown to outweigh its potential for prejudice.[32]

> The trial court must exercise its discretion in weighing the probative value of the evidence against its prejudicial effect, and that decision will be disturbed only if the court abused its discretion.[33]

---

[32]*State v. Robtoy,* 98 Wn.2d 30, 42, 653 P.2d 284 (1982); *State v. Anderson,* 41 Wn. App. 85, 100, 702 P.2d 481 (1985).

[33]*Robtoy,* at 42.

Proof of motive, if relevant, is admissible under ER 404(b). Motive is an inducement, or "that which leads or tempts the mind to indulge [in] a criminal act".[34] It is generally held to be proper for the prosecution to offer evidence of motive for the commission of crime, even when the evidence of motive may reveal the commission of another crime by the defendant.[35]

The defendant's probation officer was permitted to testify that he was supervising the defendant's probation, and that at one time the defendant had asked him for a gun permit because he said he was afraid of the decedent. The probation officer described the relationship between defendant and decedent as a volatile one in which there had been "angry exchanges over a period of time". He said he thought the reason for this animosity was the defendant's belief that the decedent was skimming profits from the defendant's mother's estate.

The trial court admitted this testimony on the basis that it tended to establish a motive for the murder. The court found that the probative value of the probation officer's testimony outweighed any prejudicial effect and held that the probation officer's position as the defendant's probation officer needed to be admitted in order to establish the relationship between the two. The crime for which the defendant was on probation was not revealed and before the probation officer testified, the jury was instructed that it was not to consider any previous misconduct of the defendant as evidence of his guilt herein.

The trial court did not abuse its discretion in allowing this testimony. It was relevant to a material issue in the case, and the trial court carefully and on the record weighed the probative value of the testimony against its potential prejudicial effect before ruling it admissible.

---

[34]*State v. Tharp*, 96 Wn.2d 591, 597, 637 P.2d 961 (1981) (quoting Black's Law Dictionary 1164 (4th rev. ed. 1968)).

[35]*See* Slough & Knightly, *Other Vices, Other Crimes*, 41 Iowa L. Rev. 325, 328 (1956).

The remaining issues, which were raised by the defendant in his pro se brief, need not be addressed at length.

Defendant argues that the trial court violated his right to a speedy trial when it granted the State a continuance on the ground that a key witness would be unavailable to testify during the anticipated trial period. The court granted the continuance and postponed the trial for approximately 3 weeks.

 Trial within 60 days is not a constitutional mandate.[36] Pursuant to CrR 3.3(h)(2), the trial court may grant a continuance when the administration of justice requires it and when a defendant will not be substantially prejudiced in the presentation of his defense.[37] The grant or denial of a requested continuance will not be disturbed on appeal absent a showing of manifest abuse of discretion.[38] The trial court did not abuse its discretion in granting the continuance and the defendant was not prejudiced by the postponement of the trial. There was no violation of the defendant's right to a speedy trial.

 Error is assigned to the trial court's decision to let the State add the name of a witness after the jury was impaneled. A prosecuting attorney must disclose to the defendant the witnesses he or she intends to call at trial. Failure to comply with this rule may result in an order compelling discovery, a continuance or dismissal of the action, but suppression of evidence is not one of the sanctions available.[39]

Shortly before opening statements were to be made, the State announced it had learned "20 seconds ago" of a dep-

---

[36]*State v. Campbell,* 103 Wn.2d 1, 15, 691 P.2d 929 (1984), *cert. denied,* __ U.S. __, 85 L. Ed. 2d 526, 105 S. Ct. 2169 (1985); *State v. Brown,* 40 Wn. App. 91, 94, 697 P.2d 583 (1985).

[37]*State v. Guloy,* 104 Wn.2d 412, 428, 705 P.2d 1182 (1985); *Brown,* at 94–95.

[38]*Campbell,* at 14; *Brown,* at 94.

[39]*State v. Laureano,* 101 Wn.2d 745, 762, 682 P.2d 889 (1984); CrR 4.7(a)(1)(i).

uty coroner who could testify about the defendant's belief that the decedent had caused his mother's death. The court expressed doubts that the State had been concealing the identity of this witness and granted a brief continuance so that defense counsel could question him. After talking to the deputy coroner, defense counsel moved to exclude his testimony on the ground that defense counsel was unable to question the jury about the effect of this new motive for killing the decedent might have on the jury's ability to presume his client innocent. The court ruled that questions of this nature had already been asked of the jury, and declined to exclude the witness' testimony.

Exclusion of the coroner's testimony would have been improper under CrR 4.7(h)(7)(i). The trial court dealt properly with the prosecutor's delay in disclosing the witness by granting the defense a continuance in order to question him.

The defendant also assigns error to the admission of testimony that the State conducted a polygraph examination. The fact that a jury is merely apprised of a lie detector test is not necessarily prejudicial if no inference as to the result is raised or if an inference to the result is not prejudicial.[40]

Upon direct examination, a defense witness testified that the defendant and several other people were at the Silver Inn Tavern at specific times on the evening of February 26. An extensive cross examination cast considerable doubt on this witness' ability to remember exactly who did what at the bar and when. Toward the end of that examination, the deputy prosecutor asked the witness if he remembered talking to a Larry Baylor in Seattle on April 13. The witness responded:

I don't recall the name. He must have been the polygraph examiner? The name doesn't ring a bell, if that's

---

[40]*State v. Descoteaux*, 94 Wn.2d 31, 38, 614 P.2d 179 (1980); *State v. Sutherland*, 94 Wn.2d 527, 529–30, 617 P.2d 1010 (1980).

what you mean. He must have been the polygraph examiner or something.

The deputy prosecutor then asked the witness a few more questions and terminated his cross examination. Defense counsel did not object to the above question or move to strike the witness' response. It is unlikely that this reference to a polygraph examination prejudiced the defendant's case. The defendant's alibi, as presented by this witness, was on shaky ground long before the witness mentioned the polygraph examiner.

Lastly, the defendant claims error with respect to the trial court's decision to allow the jury to recess overnight during its deliberations. Since the record provides no basis for review, we cannot consider this issue.[41]

The evidence of the defendant's guilt was sufficient to sustain his conviction of murder in the first degree.

Affirmed.

DOLLIVER, C.J., UTTER, BRACHTENBACH, DORE, PEARSON, CALLOW, and GOODLOE, JJ., and HAMILTON, J. Pro Tem., concur.

After modification, further reconsideration denied May 13, 1986.

---

[41]*State v. Stockton*, 97 Wn.2d 528, 530, 647 P.2d 21 (1982); *State v. Stevenson*, 16 Wn. App. 341, 345, 555 P.2d 1004 (1976).