IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 71135-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| SAMUEL RAYMUNDO, | ) | |
| | ) | |
| Appellant. | ) | FILED: April 20, 2015 |

SPEARMAN, C.J. — As Tukwila police approached the scene of a fatal one-car accident, the driver, Samuel Raymundo, walked away in the opposite direction. Police eventually found Raymundo, transported him to a hospital, and made a warrantless blood draw to preserve evidence of his blood alcohol level. He appeals his convictions for vehicular homicide and felony hit and run, arguing that the court should have suppressed the blood test results, the State did not lay a proper foundation to admit the results, and there was insufficient evidence to support a conviction for hit and run. We affirm.

FACTS

Based on evidence indicating that Raymundo caused the death of his passenger by driving while under the influence of alcohol, the State charged him with vehicular homicide, felony hit and run, reckless driving, and driving while license suspended. Prior to trial, Raymundo pled guilty to driving while license suspended. He also moved to suppress the blood alcohol evidence, arguing that the State was required to obtain a

warrant before drawing his blood. The trial court disagreed, ruling that exigent circumstances justified the warrantless blood draw. The court made the following oral and written findings of fact.

At approximately 12:30 a.m. on March 2, 2012, Raymundo was driving on East Marginal Way in Tukwila when his car left the road. The ensuing crash killed his cousin and sole passenger, Jaime Hernandez.

Police arrived on the scene at 12:43 a.m. As they approached, Officer Sanjay Prasad of the Tukwila Police Department saw two men standing near the accident scene. One of the men, later identified as Raymundo, walked away down an embankment. Officer Prasad asked the other man, Douglas Lower, what he saw. After discovering that a person was trapped under the vehicle, Prasad requested the fire department and medical aid to respond. Shortly thereafter, the fire department and additional police, including a K-9 unit, arrived on the scene.

At 12:52 a.m., a police dog found Raymundo and bit him on the leg. At 12:59 a.m., witness Lower positively identified Raymundo as the person who left the scene of the accident.

At 1:05 a.m., fire department personnel confirmed that Jaime Hernandez was deceased. Raymundo was then transported to Highline Hospital for treatment of his bite wounds. Officer Prasad continued to manage the scene, taking photographs, taping off the area, dealing with traffic and briefing other officers, until 1:34 a.m. He then returned to his station to pick up DUI paperwork and blood draw equipment.

No. 71135-1-I/3

At 1:54 a.m., Officer Prasad arrived at the hospital where medical staff were treating Raymundo. Officer Prasad immediately read Raymundo his implied consent, special evidence, and Miranda[1] warnings.

At 1:58 a.m., approximately one hour after police apprehended and identified Raymundo, hospital staff drew his blood. Test results showed that Raymundo's blood alcohol level was 0.13, well above the legal limit of 0.08.

Officer Prasad admitted during pretrial testimony that he had never written a search warrant and knew little about the procedures for doing so. Officer Donald Dart, a Tukwila Police Department traffic investigator who arrived on the accident scene around 1:30 a.m., did not consider getting a search warrant and had never sought one for blood alcohol evidence in this type of case.

In denying Raymundo's motion to suppress, the trial court emphasized the exigency created by Raymundo's medical treatment:

> Officer Prasad's not a medical professional. When he says he can't intervene and stop treatment, I think that makes an abundance of sense. That's just common sense. A police officer cannot dictate what medical treatment is taking place.
>
> So Officer Prasad, again, is faced with the situation where Mr. Raymundo is being treated. He doesn't know if the blood may potentially be compromised or the blood draw somehow may be invalidated. And because Mr. Raymundo is actively being treated and seen at the hospital, that also creates an exigent circumstance. Verbatim Report of Proceedings (VRP) (09/30/13) at 112-13.

The court subsequently entered the following conclusion of law:

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3

> Based on the gravity of the case, the fact that the defendant caused delay by leaving the scene, had to be transported to the hospital for treatment and the dissipation of alcohol in the blood by the time delay between the accident and the blood draw, exigent circumstances existed.

CP at 54.

At trial, the witnesses testified consistent with their pretrial testimony. In addition, Officer James Sturgill testified that he tracked Raymundo with a police dog for eight or nine minutes. The track led away from the scene and then back toward it, ending about 200 feet from the accident scene. There were "lights and sirens going" during the track. VRP (10/14/13) at 101.

Officer Prasad testified that he spoke with Raymundo at the hospital. Raymundo said he had four or five beers prior to the accident. Raymundo also said "he got scared and that's why he ran from the police." VRP (10/07/13) at 85. Officer Prasad identified photographs he took of a case of beer and opened beer cans around Raymundo's vehicle. He also testified that the blood draw kit he took to the hospital included vials containing a powder.

Asa Louis, a toxicologist with the Washington State Patrol toxicology lab, testified that he tested the vials containing Raymundo's blood. The vials were "gray top" tubes. VRP (10/07/13) at 50. Louis said such tubes contain two chemicals -- an enzyme inhibitor or poison known as sodium fluoride, and an anticoagulant known as potassium oxalate. As part of their quality control, manufacturers of the vials "insure that the two chemicals meet [Food and Drug Administration] requirement[s]." VRP (10/07/13) at 51-52. The vials are labelled with information regarding the additives they contain. Louis testified that his

4

lab relies on the labelling and that the vials in this case had labels listing the correct additives. He further testified that if the anticoagulant is not in the vials, the blood will clot. The fact that the blood samples in this case did not clot showed that the vials contained anticoagulant.

Louis conceded on cross-examination that he did not attempt to locate certificates of compliance for the vials in this case. He also testified, however, that as far as he knew, he had not received any faulty vials in the approximately 10,000 blood analyses he had performed.

Raymundo testified that, after handing his phone to Lower, he left the accident scene to get help for his cousin. He did not remember telling Officer Prasad that he left the accident scene to avoid police.

A jury found Raymundo guilty as charged. He appeals his convictions for vehicular homicide and felony hit and run.

## DECISION

### Warrantless Blood Draw

Raymundo first contends the trial court erred in denying his motion to suppress his blood test results. We review the trial court's findings of fact for substantial evidence and its conclusions of law de novo. State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). We defer to the trial court on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970, *abrogated in part on other grounds,* Crawford v. Washington, 541 U.S. 36, 124

S.Ct. 1354, 158 L.Ed.2d 177 (2004). We conclude the court did not err in denying the motion to suppress.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Constitution of the State of Washington prohibit warrantless searches or seizures unless one of the exceptions to the warrant requirement applies. Garvin, 166 Wn.2d at 249. "[T]he taking of blood samples constitutes a 'search and seizure' within the meaning of U.S. Const. amend. 4 and Const. art. 1, § 7." State v. Judge, 100 Wn.2d 706, 711, 675 P.2d 219 (1984); State v. Curran, 116 Wn.2d 174, 184, 804 P.2d 558 (1991) (nonconsensual blood test for suspected commission of vehicular homicide is a search), *overruled on other grounds by* State v. Berlin, 133 Wn.2d 541, 548, 947 P.2d 700 (1997). The State bears the burden of demonstrating that a warrantless search or seizure falls within an exception to the warrant requirement. State v. Hendrickson, 129 Wn.2d 61, 71, 917 P.2d 563 (1996).

One recognized exception allows a warrantless search and seizure if exigent circumstances exist. State v. Terrovona, 105 Wn.2d 632, 644, 716 P.2d 295 (1986); Missouri v. McNeely, __ U.S. __, 133 S.Ct. 1552, 1558-59, 185 L.Ed.2d 696 (2013). "The rationale behind the exigent circumstances exception 'is to permit a warrantless search where the circumstances are such that obtaining a warrant is not practical because the delay inherent in securing a warrant would compromise officer safety, facilitate escape or permit the destruction of evidence.'" State v. Smith, 165 Wn.2d 511, 517, 199 P.3d 386 (2009) (quoting State v. Audley, 77 Wn. App. 897, 907, 894 P.2d 1359 (1995)). A court must evaluate the totality of the circumstances in determining whether exigent

circumstances exist. McNeely, 133 S.Ct. at 1556; Smith, 165 Wn.2d at 518. Relevant circumstances include "the natural and inexorable dissipation of blood alcohol" levels over time, the gravity of the offense, and the relative availability of telephonic warrants. State v. Komoto, 40 Wn. App. 200, 211-14, 697 P.2d 1025 (1985). The natural dissipation of blood alcohol does not constitute a per se exigency, but rather is one factor in assessing the reasonableness of a warrantless blood draw. McNeely, 133 S.Ct. at 1561-63.

The totality of the circumstances in this case justified a warrantless blood draw. It is undisputed that the blood alcohol evidence began dissipating after Raymundo's accident.[2] It is also undisputed that the police were investigating a serious offense – vehicular homicide. We held in Komoto that "circumstances are more clearly exigent where the offense is a 'serious crime'" such as "negligent homicide." Komoto, 40 Wn. App. at 212. We concluded that the combination of dissipating blood alcohol evidence and a serious offense justified a warrantless entry of the suspect's home in order to take a blood sample. Komoto, 40 Wn. App. at 213. We emphasized that "the need for the *immediate* taking of a blood sample under the circumstances . . . was a sufficient exigency to justify proceeding without a warrant, or without attempting to obtain a telephonically authorized warrant." Komoto, 40 Wn. App. at 214. While Komoto involved

---

[2] As Chief Justice Roberts noted in his concurring opinion in McNeely, "[a]lcohol dissipates from the bloodstream at a rate of 0.01 percent to 0.025 percent per hour." (Citation omitted) 133 S.Ct. at 1571. Eight of nine justices in McNeely also recognized that "a significant delay in testing will negatively affect the probative value of [blood test] results." 133 S.Ct. at 1561 (Roberts, C.J., concurring in part and stating that "[w]hen experts have worked backwards to identify a defendant's BAC at the time he was driving, defense attorneys have objected to that evidence, courts have at times rejected it, and juries may be suspicious of it." (Citations omitted)). 133 S.Ct. at 1571, n.1.

the additional concern that the defendant might consume additional intoxicants in his home and render any blood tests inaccurate, the present case involved additional factors as well.

Raymundo's flight from the scene delayed his apprehension and identification by approximately 15 minutes and necessitated his transport to a hospital, causing additional delay and a need for treatment. The treatment included the administration of intravenous fluids and medication. As the court noted in its oral ruling,[3] Officer Prasad was "faced with the situation where Mr. Raymundo is being treated. He doesn't know if the blood may potentially be compromised or the blood draw somehow may be invalidated." VRP (09/30/13) at 113.

Considering the totality of the circumstances, the trial court did not err in concluding that exigent circumstances justified the warrantless blood draw.[4]

### Foundation for Blood Test Results

Raymundo contends the trial court abused its discretion in admitting the blood test results without a proper foundation. Specifically, he contends there was insufficient evidence that the blood vials contained an enzyme poison that is required by law and is a prerequisite to admissibility. Again, we disagree.

---

[3] The trial court expressly incorporated its oral findings and conclusions into its written findings and conclusions.

[4] We note that the evidence concerning the Tukwila officers' lack of experience with warrant procedures is concerning, particularly in light of the McNeely court's clear admonition that police use telephonic or other warrant procedures whenever this can be done in a timely manner. See McNeely, 133 S.Ct. at 1568-69.

Blood-alcohol test results are admissible only if the blood sample was preserved with both an anticoagulant and an enzyme poison "sufficient in amount to prevent clotting and stabilize the alcohol concentration." WAC 448-14-020(3)(b); State v. Wilbur-Bobb, 134 Wn. App. 627, 630, 141 P.3d 665 (2006). The State must present prima facie evidence of compliance with this regulation. State v. Brown, 145 Wn. App. 62, 70, 184 P.3d 1284 (2008). In determining whether a prima facie case has been made, the trial court must assume the truth of the State's evidence and draw all reasonable inferences in the State's favor. RCW 46.61.506(4)(b); Brown, 145 Wn. App. at 71. We review a trial court's ruling on the admissibility of blood test evidence for an abuse of discretion. Brown, 145 Wn. App at 69. A court abuses its discretion if it admits blood test evidence absent prima facie evidence of compliance with the regulation.

In Brown, 145 Wn. App at 71, the court concluded the following showing established a prima facie case:

> The toxicologist testified that vials used for the collection of samples for a blood alcohol test are provided by the manufacturer with powdery chemicals, which he identified as potassium oxalate and sodium fluoride. He also stated that he read the labels on the vials that contained Mr. Brown's blood, which indicated that the vials contained sodium fluoride and potassium oxalate. The toxicologist also testified if those chemicals were not present, the blood would be clotted and no alcohol would be detected in the samples. The toxicologist observed in this case that the blood in the samples was not clotted and alcohol was detected in the samples.

In Wilbur-Bobb, 134 Wn. App. at 630-32, we held a prima facie case regarding the enzyme poison was established by a toxicologist's testimony that sodium fluoride is an enzyme poison, and evidence that labels on the vials showed they contained sodium fluoride. And

in State v. Barefield, 47 Wn. App. 444, 458, 735 P.2d 1339 (1987), a toxicologist's testimony that the manufacturer always put anticoagulants in the vials and that the blood sample was unadulterated when he ran the tests was prima facie evidence of compliance with the anticoagulant requirement.

Here, the toxicologist testified that the vials used to test Raymundo's blood were "gray top tubes," and that the gray top signifies the presence of the anticoagulant and enzyme poison required by the applicable regulation. VRP (10/8/13) at 50 He further testified that the manufacturer of the vials must adhere to FDA requirements, including the requirement that they ensure the presence of an anticoagulant and enzyme poison, that the manufacturers do this as part of their quality control, and that his lab relies on the manufacturer's certificates of compliance with FDA rules. The vials analyzed in this case bore labels from the manufacturer identifying the chemicals inside them. The toxicologist also testified that the presence of the anticoagulant was demonstrated by the fact that the remaining blood in the vials had still not clotted.

Drawing all reasonable inferences from the evidence in the State's favor, we conclude the trial court did not abuse its discretion in finding a sufficient foundation to admit the blood test results.

### Hit and Run

Last, Raymundo contends his hit and run conviction is not supported by sufficient evidence. Evidence is sufficient to support a finding of guilt if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. State v. Rose, 175 Wn.2d 10, 14, 282

No. 71135-1-I/11

P.3d 1087 (2012). A challenge to the sufficiency of the evidence admits the truth of the State's evidence and any reasonable inferences drawn from it. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

To convict Raymundo of felony hit and run under the instructions in this case, the State had to prove that he failed to satisfy any of the following statutory duties:

> (a) Immediately stop the vehicle at the scene of the accident or as close thereto as possible;
> (b) Immediately return to and **remain at the scene of the accident until all duties are fulfilled**;
> (c) Give his name, address, insurance company, insurance policy number and vehicle license number, and exhibit his driver's license, to any person struck or injured or the driver or any occupant of, or any person attending, any vehicle collided with; **or if none of the persons specified are in condition to receive the information and no police officer is present, immediately report the accident to the nearest office of the police**, give his name, address, insurance company, insurance policy number, and vehicle license number, and exhibit his driver's license, after fulfilling all other obligations insofar as possible on his part to be performed;
> (d) Render to any person injured in the accident reasonable assistance, including the carrying or making of arrangements for the carrying of such person to a physician or hospital for medical treatment if it is apparent that such treatment is necessary or such carrying is requested by the injured person or on his behalf [.][5]

Douglas Lower testified that he heard the crash and went immediately to the accident scene. Raymundo walked from the car to Lower, handed him a phone, and asked him to give their location to the 911 operator he had called. Lower heard a police car to the north. Raymundo then walked away to the south. Officer Prasad similarly testified that Raymundo walked away as he approached the scene. Raymundo told

---

[5] CP at 97-98 (emphasis added).

Prasad he walked away to avoid the police. Viewed in a light most favorable to the State, this evidence supported inferences that Raymundo left the scene before a police officer was present and without fulfilling his duties under section (c) of the instruction.[6]

Affirmed.

Spearman, C.J.

WE CONCUR:

Trickey, J.

Cox, J.

___

[6] We reject Raymundo's suggestion that he might have satisfied his duties under section (c) of the instruction by giving the required information to the 911 operator. In addition to there being no evidence that Raymundo gave any such information to the operator, nothing in the instruction indicates that a 911 operator is a proper recipient of such information. Nor does Raymundo cite any authority supporting that proposition. Moreover, the State correctly points out that a person must "exhibit his driver's license" to a proper recipient. Raymundo does not explain how this can be accomplished over the phone.