THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JUNIUS CHAMBERS, Appellant.

First Department, February 26, 1987

APPEARANCES OF COUNSEL

*Miriam J. Hibel* of counsel (*David P. Friedman* with her on the brief; *Philip L. Weinstein,* attorney), for appellant.

*Barbara A. Sheehan* of counsel *(Mark Dwyer* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

CARRO, J.

While we reject defendant's argument that the circumstantial evidence against him was insufficient to prove his guilt of murder in the second degree and other related crimes beyond a reasonable doubt, we do agree that he was deprived of a fair trial when the trial court admitted into evidence the double hearsay statement of the deceased that defendant told her he intended to visit her at her apartment at a particular time on the very day she was killed. In view of the fact that the prosecutor relied on this hearsay statement to place defendant at the scene of the crime and that the jury specifically requested to have that portion of the trial testimony read back to it, we cannot conclude that this error was harmless. Accordingly, we reverse defendant's convictions of murder in the second degree, robbery in the first degree and burglary in the second degree and remand for a new trial.

On February 4, 1981, Lilly Frenkel was found dead in her apartment. Her wrists were slit and a pillow lay over her face. A plastic bag had been tied around her head. An autopsy revealed that she died of a head wound and asphyxiation. The wrist cuts were determined to have been made by her murderer while she was still alive.

There was no sign of a forced entry into the apartment. The apartment door was found locked. The living room was left basically undisturbed. In the bedroom all the drawers had been removed from a jewelry box on the dresser. There was some blood on the side of a stepstool in the bathroom and a great deal of blood in the kitchen, viz., on the refrigerator, the floor, cabinets, drawers and under the counter. The blood was determined to be that of the deceased. From the refrigerator door the police were able to lift a palm print which was identified as that of the defendant. The palm print, which contained no blood, was located on an area of the door where the blood of the deceased had been splattered and was directly underneath fingerprints which were too smeared for identification, but which contained blood. In the refrigerator, a ⅝th ounce bag of cocaine was found.

The evidence at trial revealed that the 33-year-old Lilly

Frenkel lived alone in her apartment, earning a living as a bookkeeper and leg waxer and by selling cocaine and Quaaludes. On February 3, 1981, between 9:00 and 10:00 A.M. Frenkel called her friend Steven Resnick, requesting that he come to her apartment to bring her some things. Resnick arrived between 11:00 and 11:30 A.M. Frenkel told Resnick that she had received a telephone call from defendant who said he planned to visit her that day at 12:30 P.M. She expressed concern to Resnick that defendant was trying to frame her and asked Resnick to take with him bags containing cocaine residue and some pills she had in the house. Between 12:30 and 1:00 P.M. another friend, Trudy King, telephoned Frenkel. Frenkel answered and told her that she would call her back, because she was "doing someone," which King took to mean that Frenkel was giving someone a leg waxing. King testified that Frenkel sounded strange. King called again at 2:00 P.M. and at other times in the afternoon and evening, each time receiving a busy signal.

Another friend, Steven Cohen, also tried reaching Frenkel on the telephone that evening in order to return her car and also received a busy signal. On the next day, he and a friend decided to go to Frenkel's apartment. After receiving no answer upon ringing her doorbell, Cohen and his companion went to the superintendent's office. The superintendent's wife took the two men to Frenkel's apartment and unlocked the door. As the door was opened an envelope from Frenkel's travel agent, which had been placed on the door between 5:30 and 6:00 P.M. the day before, fell to the floor. When Cohen pushed the door open he saw Frenkel lying on the floor. The police were summoned immediately.

On March 2, 1981, defendant's car was recovered in Dover, Vermont. The car was taken to Dover Town Garage. On April 9, 1981, it was towed to an impound garage in Wilmington, Vermont. When the man towing the car stepped into the driver's side to release the brake and put the car in neutral, he pressed his foot down and heard glass break. He reached down and put his hand through holes in the carpet, retrieving a gold pocket watch and a platinum pin with three stones. These jewelry items were identified as the property of Frenkel. Defendant was subsequently indicted for the murder of Frenkel.

Defendant was convicted of three counts of murder in the second degree, one count of robbery in the first degree and one count of burglary in the second degree. He was sentenced to

concurrent terms of imprisonment of 15 years to life on the murder counts and 5 to 15 years on the other counts. The only issue meriting our review is the propriety of the admission into evidence of the hearsay statement of the deceased that defendant told her he was going to visit her.

It is well recognized that the hearsay rule does not exclude the admission of out-of-court statements demonstrating the state of mind of the declarant when that state of mind is an issue in the case. *(United States v Pheaster,* 544 F2d 353, 376; *United States v Brown,* 490 F2d 758, 762.) A particular species of the state-of-mind exception, derived from the seminal case *Mutual Life Ins. Co. v Hillmon* (145 US 285), additionally holds that when a particular act of the declarant is at issue, the declarant's statement of a future intent to perform that act is admissible as proof of the declarant's intent on that issue and as inferential proof that the declarant carried out his intent *(supra,* at pp 295-296; *United States v Pheaster, supra; United States v Brown, supra; People v Malizia,* 92 AD2d 154, 155, *affd* 62 NY2d 755). The majority of courts, beginning as early as the late 1800's in such cases as *Hunter v State* (11 Vroom [40 NJL] 495) and *Mutual Life Ins. Co. v Hillmon (supra)* have further extended this species of the state-of-mind exception, although not without considerably cogent objections from legal scholars and a minority of judicial critics, to hearsay statements of a declarant's future intent to perform an act with another person as circumstantial proof that the act did occur and, by necessary implication, that the other person participated in the act. *(See,* 6 Wigmore, Evidence § 1725, n 1 [Chadbourn rev 1976], for a full listing of relevant decisions.)

This issue has evoked especially substantial controversy in criminal cases where the statement sought to be admitted typically involves a highly prejudicial statement by the declarant-deceased that he intended to meet the defendant at a particular place and is offered to prove circumstantially that defendant and the declarant did meet and that defendant had the opportunity to kill the declarant. Because no New York court had previously addressed this issue in a thorough and analytical fashion, this court, in *People v Malizia (supra),* undertook such an analysis. After carefully weighing the major arguments raised in opposition to extension of the evidentiary exception to such facts, this court joined the overwhelming majority of jurisdictions in upholding the admissibility of such evidence due to its high degree of trustwor-

thiness and its necessity, given the lack of alternative or more reliable evidence. (92 AD2d, at pp 155, 160; *but see, Clark v United States,* 412 A2d 21, 29-30 [DC App].)

However, to reduce the potential for prejudice against a defendant in applying the state-of-mind exception to such facts, the *Malizia* court exacted a rigid test for admission of a statement by a deceased of intent to meet another. Such a statement is admissible only "where the statement is made under circumstances that make it probable that the expressed intent was a serious one, and that it was realistically likely that such a meeting would in fact take place." (92 AD2d, at p 160.) In requiring that the statement contain these strong indicia of reliability and trustworthiness, the court in *Malizia* was also able to neutralize the otherwise potent arguments raised in opposition to extending the hearsay exception to such statements.

One objection often raised against admitting into evidence statements of intent to perform an act with another as proof that the act occurred is that a considerable contingency is added to the fulfillment of the act in requiring the other person's cooperation, which contingency, it is argued, detracts from the reliability of the inference that the act indeed occurred. *(United States v Pheaster, supra,* at p 376; *People v Malizia, supra,* at p 160.) In *Malizia* we accepted as persuasive the opposing analysis which regards this added contingency as but one of a host of contingencies which could materialize to frustrate fulfillment of the act. Such contingencies affect the weight to be accorded the statement, not its admissibility, provided sufficient indicia of reliability and trustworthiness are preliminarily met. However, when the contingencies are so copious as to accord the statement little probative value, it scarcely needs argument that the statement's weak probative value can be so outweighed by the extreme prejudice to the defendant as to warrant its exclusion.

A second objection is that the inference to be drawn from expressions of intent to perform some act with another person is essentially inconsistent with the purpose of the state-of-mind exception, which is to prove the declarant's intent and inferentially his conduct. To infer from a statement of intent to perform an act with another that the act took place, the trier of fact must infer that the third person also had the intent of performing the act and acted upon that intent, an inference which has nothing to do with the declarant's state of

mind. The reasons for admitting such statements nevertheless are that they are often expressed under circumstances virtually assuring their verity, that they may be the only means available of resolving the issue at hand and that everyday experience supports the view that people are often likely to meet with those whom, in the normal course of events, they say they are going to meet. *(People v Malizia,* 92 AD2d, at p 160.)

Illustrative of this reasoning is a New Jersey criminal case, *Hunter v State* (11 Vroom [40 NJL] 495, *supra)* quoted approvingly and at length in *Mutual Life Ins. Co. v Hillmon* (145 US, at p 299). In *Hunter,* the deceased told his son and wrote to his wife that he was on his way to Camden, New Jersey, for a business meeting with Hunter. In admitting this information to infer that the meeting occurred, the court stated: "In the ordinary course of things it was the usual information that a man about leaving home would communicate for the convenience of his family, the information of his friends, or the regulation of his business. At the time it was given, such declarations could, in the nature of things, mean harm to no one; he who uttered them was bent on no expedition of mischief or wrong, and the attitude of affairs at the time entirely explodes the idea that such utterances were intended to serve any purpose but that for which they were obviously designed. If it be said that such notice of an intention of leaving home could have been given without introducing in it the name of Mr. Hunter, the obvious answer to the suggestion I think is, that a reference to the companion who is to accompany the person leaving, is as natural a part of the transaction as is any other incident or quality of it. If it is legitimate to show by a man's own declarations that he left his home to be gone a week, or for a certain destination, which seems incontestable, why may it not be proved in the same way that a designated person was to bear him company? At the time the words were uttered or written, they imported no wrong-doing to any one, and the reference to the companion who was to go with him was nothing more, as matters then stood, than an indication of an additional circumstance of his going. If it was in the ordinary train of events for this man to leave word, or to state where he was going, it seems to me it was equally so for him to say with whom he was going." *(Hunter v State, supra,* at p 538.)

The most significant factor for the *Hunter* court was that the statement was not uttered under circumstances demon-

strating any ulterior purpose or under circumstances presenting any indicia of unreliability. In the context in which the statement was made as Hunter was about to embark on a scheduled business trip, it projected great trustworthiness. Using this same reasoning, this court, in *Malizia,* joined the overwhelming majority of courts in permitting the admission of hearsay statements of intent by a declarant to meet the defendant as proof that the meeting took place, provided, of course, that the statements are shown to have been made under circumstances making it highly probable that the intent to meet was a serious one and that it was realistically likely such a meeting would, in fact, take place. *(People v Malizia,* 92 AD2d, at p 160.) That test was met under the *Malizia* facts. There was evidence there that the declarant-deceased had previously met the defendant at the precise location for similar transactions, was meeting the defendant to give him money the deceased owed him, asked his brother to accompany him to the meeting, took bags of money with him and was seen getting into a car identified as that of the defendant. These facts provided strong evidence of the serious intent of the meeting and that it was realistically likely to occur.

The facts of this case are so lacking in indicia of reliability as to bear little or no comparison with those of *Malizia (supra)* and cannot be admitted under the state-of-mind exception, even as extended under the *Hillmon/Pheaster* line of cases. In a conversation with a friend, the deceased related that the defendant had telephoned her earlier and said he intended to visit her that same day at 12:30 P.M. A critical difference here is that the declarant expressed what she believed was another person's, the defendant's, intent to perform and act, and we are completely unaware of the circumstances under which defendant expressed that intent to her.

If the pertinent issue at trial had been the reaction of the declarant to the allegedly planned meeting, her apprehension about the meeting or her reason for having certain drugs removed from her apartment, then the statement about the meeting would arguably have been relevant to her state of mind on these issues. Obviously, those were not the purposes intended in having the statement admitted. The sole intended purpose was to prove defendant's state of mind, that he planned the meeting, and to prove that he carried out his intent. The deceased was obviously not the best person situated to know or surmise what the defendant's intentions were.

Yet, implicit in admitting this evidence to prove that the meeting occurred is the presumption that decedent correctly heard, analyzed and interpreted defendant's communication to her, even when there is absolutely no evidence before the trier of fact of the context or circumstances under which this communication was made. There is no evidence from which anyone can determine if defendant had made a firm or tentative plan, whether he was hoaxing or even threatening. There is no way to measure the seriousness of the intent.

Furthermore, when the occurrence of the meeting necessarily depended in its entirety on defendant's motivations, actions and intent, which are unknown under these facts, there is also no plausible manner of calculating whether the meeting was realistically likely to occur. The deceased was a completely passive actor with regard to this proposed meeting. It matters little that she may have thought the meeting was impending, since it is the likelihood of the meeting from defendant's point of view which must be determined, and that is impossible to estimate. There is not a scintilla of information upon which we can rely to gauge the trustworthiness and firmness of defendant's intent as stated to the deceased.

Due to the double hearsay nature of this testimony, there is not even adequate proof of defendant's exact statement. In the usual situation, the trial witness testifies as to what he heard the declarant say regarding an intent to do a certain act. Thus, at least the trial witness heard the statement in question and can be cross-examined as to the exact words he heard and the context in which or the circumstances under which the statement was made. However, the witness in this trial did not hear defendant's conversation and can only testify to the interpretation given by the decedent and the circumstances under which she related the hearsay conversation, circumstances which are irrelevant in determining, for purposes of admissibility, the trustworthiness of the defendant's communication.

What must be known in order to meet the *Malizia* test are the circumstances under which defendant expressed his intent, circumstances absolutely unbeknownst to us. In *Hillmon* (145 US 285, *supra)* and *Hunter v State* (11 Vroom [40 NJL] 495, *supra)* it was the natural, nonsuspicious, business-like manners in which the statements therein were made which provided a solid and articulable basis for establishing for the reliability of those statements so as to justify relaxation of the hearsay rules in order to admit those statements into evi-

dence. Because the trustworthiness of the statement at bar is not susceptible to evaluation and quantification, the statement should have been excluded. Given the prejudicial effect this statement undoubtedly had on this case, where only circumstantial evidence placed the defendant at the apartment on the day of the killing, we cannot say the error was harmless.

Accordingly, the judgment of the Supreme Court, New York County (Joan Carey, J.), rendered May 3, 1984, convicting defendant, after a trial by jury, of three counts of murder in the second degree and one count each of robbery in the first degree and burglary in the second degree and sentencing him to three indeterminate terms of imprisonment of from 15 years to life on the murder counts, to run concurrently with each other and with concurrent sentences of 5 to 15 years on the robbery and burglary counts, should be reversed, on the law, and the matter remanded for a new trial.

SANDLER, J. P. (dissenting). The facts are fairly and comprehensively set forth in the court's opinion. I agree the evidence is sufficient to sustain the jury's verdict convicting defendant of murder in the second degree. Indeed, the presence of the defendant's palm print on the deceased's refrigerator in close juxtaposition to bloodstained fingerprints, coupled with the other circumstances presented, provide a compelling basis for the jury's verdict.

Turning to the issue that divides the court, I am unable to agree with the court's conclusion that the circumstances presented in support of admissibility of the deceased's statement that she was to meet the defendant at her apartment do not meet the test set forth in *People v Malizia* (92 AD2d 154, 160, *affd* 62 NY2d 755), that such a statement is admissible only "where the statement is made under circumstances that make it probable that the expressed intent was a serious one, and that it was realistically likely that such a meeting would in fact take place."

By any standard, the circumstances detailed in the court's opinion meet the test set forth in *Malizia (supra),* and indeed meet that test more convincingly than did the circumstances in many cases in which the evidence was found admissible. The court's opinion seems to me to clearly err in its apparent conclusion that admissibility of such a statement is permissible *only* under the circumstances set forth in *Hunter v State* (11 Vroom [40 NJL] 495), cited with approval by the United States Supreme Court in *Mutual Life Ins. Co. v Hillmon* (145

US 285), in which the court relied on the circumstance that the statement in question was uttered in the ordinary course of events, and at a time when no motive to lie was discernible. To the extent to which it is accepted that there are circumstances under which such a statement of intent is admissible, the controlling test should surely be one of reliability, not whether that reliability emanates from the particular circumstance that it was uttered in the ordinary course of events.

Although I believe that this court's decision in *Malizia (supra)* should be dispositive of the issue here presented, I recognize that the central issue has never been addressed by the Court of Appeals, that court having found in *Malizia* that the issue had not been preserved for its consideration. Nor is the question one as to which any confident forecast can be made as to how the Court of Appeals is likely to resolve it. Although the overwhelming weight of judicial authority since *Mutual Life Ins. Co. v Hillmon (supra)* has sustained admissibility of such statements under the state-of-mind exception to the hearsay rule, the preponderant opinion of scholars in the area of evidence for many years has doubted the appropriateness of the application of the state-of-mind exception to permit admissibility of statements of the kind admitted in *Hillmon,* in *Malizia,* and in this case. This scholarly dissent from preponderant judicial authority is of particular interest because of the undoubted fact that, in general, the scholars in the field of evidence have been more inclined than the courts, where relevance is apparent, to relax the rules limiting consideration of evidence by the fact finders.

Because of the inherently interesting nature of the issue, the unusual circumstances presented by the split between the decided cases and scholarly opinion, and my own view that the rule adopted by most courts is a sound one, some further discussion of this question may be appropriate.

The leading judicial authority, of course, remains *Mutual Life Ins. Co. v Hillmon (supra).* In an action to recover on a life insurance policy, the Supreme Court sustained under the state-of-mind exception to the hearsay rule the admissibility of a declarant's statement that he was going to be with another person for a period of time as evidence that such an event in fact took place. In the *Hillmon* opinion, the Supreme Court cited with approval and quoted extensively from *Hunter v State* (11 Vroom [40 NJL] 495, *supra)* a prosecution for murder in which that court had sustained the admissibility of a statement by the deceased that he was going to Camden, New

Jersey, with the defendant for a business meeting. In the excerpt quoted by the Supreme Court, the court in *Hunter* said: " 'If it is legitimate to show by a man's own declarations that he left his home to be gone a week, or for a certain destination, which seems incontestable, why may it not be proved in the same way that a designated person was to bear him company?' " (145 US, at p 299.)

Almost every court to consider the issue in criminal cases since *Hillmon (supra)* has followed *Hillmon* in sustaining admissibility. *(See, United States v Pheaster,* 544 F2d 353; *People v Alcalde,* 24 Cal 2d 177, 148 P2d 627; *see also,* 6 Wigmore, Evidence § 1725, n 1 [Chadbourn rev 1976], which includes in a more general listing of decisions a number that sustained admissibility under essentially the same circumstances with which we are concerned.)

The most significant reported decision to reach a contrary conclusion was that of the District of Columbia Court of Appeals in *Clark v United States* (412 A2d 21) in which that court, clearly influenced by scholarly criticism of the *Hillmon* doctrine, rejected its application on the basis of the House Report accompanying Federal Rules of Evidence rule 803 (3), setting forth the Federal state-of-mind exception, which said that the *Hillmon* doctrine was to be limited to include statements of intent by the declarant only to prove his future conduct, and not the anticipated conduct of another person.

It is of some interest that what may fairly be considered a judicial consensus in favor of applying the *Hillmon* doctrine in criminal cases came about notwithstanding a reference to it by Justice Cardozo in *Shepard v United States* (290 US 96, 105), a case involving a different but arguably related issue, that suggested a disposition to limit the *Hillmon* doctrine to the fact that the question arose in an insurance case, and the strong, oft-quoted dissenting opinion of Justice Traynor in *People v Alcalde (supra)* which, in part relying on Justice Cardozo's comment, vigorously opposed admissibility.

Turning to the scholarly dissent, it may be noted that the *Hillmon* decision was originally accepted as a sensible resolution of the problem presented, and that it received the emphatic support of Professor Wigmore. For our immediate purposes, the most significant development in the academic response to the *Hillmon* doctrine occurred with the publication of Professor Maguire's famous article, *The Hillmon Case —Thirty-Three Years After* (38 Harv L Rev 709 [1925]), which

marks a turning point in the scholarly view of the issue, and whose essential approach undoubtedly has become today the preponderant view of the scholars.

The essence of his criticism, responding to the facts set forth in the *Hillmon* case itself, was put forth in the following words *(op. cit.,* at 717): "To put the problem specifically: Even if Walters was planning to travel with Hillmon, how shall we prove that Hillmon was willing to and did accept him as a companion? By Walters' hearsay declaration? Hardly, unless we drill a new and unusually deep hole in the hearsay rule. It is not customary to accept one man's extra-judicial assertions as evidence of another's mental state."

The essence of this criticism was adopted in the note of the Committee on the Judiciary, House of Representatives Report No. 93-650, accompanying Federal Rules of Evidence, rule 803 (3), the Federal state-of-mind exception, which stated that the committee intended the rule to limit the *Hillmon* doctrine "so as to render statements of intent by a declarant admissible only to prove his future conduct, not the future conduct of another person." The same formulation was adopted by the distinguished scholars who prepared the Proposed Code of Evidence for the State of New York in their comment with regard to the proposed state-of-mind exception to the hearsay rule.

Notwithstanding a natural hesitation to differ with the considered view of distinguished scholars in an area of their special competence, I have come to think that the analysis set forth in Professor Maguire's article is less convincing than it at first appears, that the formulation of the House Committee Report, which follows that analysis, imposes limitations on the admissibility of deceased declarants' statements of intent that are essentially artificial and unrealistic, and that the ultimate effect of this approach is to withhold from juries the right to consider reliable evidence of undoubted probative value that jurors are entirely capable of evaluating without any undue unfairness to defendants.

Turning to Professor Maguire's analysis, it should be observed preliminarily that there are many situations, examples of which will be considered later, in which a deceased declarant's statement of intent with regard to another would justify an inference with regard to the other's actions without presenting a hearsay problem. The issue in *Hillmon* (145 US 285, *supra),* and in the criminal cases which have considered the

problem since *Hillmon,* arises from the undoubted fact that implicit in the statement of the deceased declarant is some information with regard to the person referred to that, considered by itself, would be excludable as hearsay.

But it does not seem to me to follow automatically from the fact that the statement of intent was undoubtedly based on, or influenced by, information that would independently be hearsay, that the jury should be denied the right to draw from the declarant's statement of intent the normal, everyday, commonsense inference that the declarant had some reason to believe that what he was intending to do was feasible. The normal test for the admissibility of circumstantial evidence is whether the proffered evidence makes more probably correct a relevant fact without any counterbalancing unfairness. It seems to me indisputably clear that in many situations the normal inference from a deceased declarant's statement of intent to meet another that the declarant had reason to believe that the meeting would take place meets that critical test of admissibility for circumstantial evidence, and does so without impairing unacceptably the hearsay rule.

No doubt a special problem is presented in this kind of situation by the fact that the unavailability of the deceased declarant for cross-examination may make it difficult on occasion for a jury to evaluate precisely the basis for declarant's intent, and in such situations cautionary instructions may well be appropriate. In my opinion, in most situations this concern would be more theoretical than real. But in any event, it seems to me doubtful that this possibility should uniformly deny a jury the right to consider the commonsense inference that a person normally does not intend to meet another unless the person has some basis for believing that the meeting will in fact occur.

Assume, for example, a case in which deceased stated that he was going to see the defendant at his home, and is thereafter found dead under circumstances pointing to the defendant as the killer. Under the approach set forth in the House Committee Report, it is clear that the statement of the deceased declarant would be admissible as evidence that he had indeed gone to the defendant's home and that a jury could infer from that fact the possibility that he may have seen the defendant, and could consider that evidence together with other evidence pointing to the defendant as the person who caused his death. However, the jury would not be allowed to learn that he had stated his intent to see the defendant, or, if

that were permitted, would not be permitted to infer from that statement that the deceased had reason to believe that the defendant would be home.

What seems to me apparent in this situation is that the House Committee Report effectively denies jurors the right to make precisely the kind of factual evaluation that jurors are qualified to make, and that it limits the inferences reasonably to be drawn from the evidence in a way that distorts the reality of the situation without a countervailing benefit. There may well be situations in which a person may intend to drop in on another without any reason to suppose that this individual is at home. Jurors are entirely capable of evaluating that possibility under the circumstances presented. But there are clearly many situations in which it is apparent that the deceased declarant would not undertake to visit the defendant unless he had good reason to know that the defendant was at home, either because he was aware from past experience that the defendant was likely to be home at the time or because of some specific communication, directly or indirectly, with the defendant.

If, as appears undisputed, the statement of a deceased declarant would be admissible as some evidence that he went to the defendant's home, it is difficult to see a persuasive reason why the jury may not consider on the basis of the relevant circumstances the obvious possibility, if not likelihood, that the deceased had formed that intent on the basis of some reason, satisfactory to him, to believe that the defendant would be home. It seems to me indisputable that the probative trustworthiness of such an inference would be greater, and the possibility of unfairness to the defendant less, than in many situations in which circumstantial evidence is unhesitatingly admitted into evidence.

Assume a different situation in which the deceased declarant told someone that he was going to meet the defendant at a place at which the defendant would not ordinarily be except for some special arrangement, and the deceased is found dead somewhere else, under circumstances independently pointing to the defendant as his killer. Under the rule favored by scholars, the statement would be admissible to establish that the deceased had gone to that place if that were relevant to an issue in the case, but would not be admissible to the extent to which the deceased said that he was going to meet the defendant there. But if the circumstances are such as to justify a jury in inferring that the deceased went to the

indicated place, it is difficult to see why the purpose of his going there, a fact inextricably linked with his intention, and the basis for his stated intention, is automatically so untrustworthy, or its admission so unfair to the defendant, that this integral part of the admitted statement should be excluded from the jury's consideration. It seems peculiarly unrealistic to exclude the jury from considering the possibility that the deceased met the defendant where, as would uniformly be the fact in criminal prosecutions, other circumstances, independent of the statement of the deceased, point to the defendant as having been guilty of the homicide.

Returning to the issue in the *Hillmon* case *(supra)* and Professor Maguire's analysis of its hearsay implications, it appears to accept that if otherwise relevant to the case, Walters' statement that he was going on a trip would have been admissible as evidence that he had in fact gone on such a trip. But is there any realistic basis to believe that he would have truthfully reported his plans to go on a trip, but for some inexplicable reason would have falsely claimed that he was going on a trip with a particular person? In the *Hillmon* case, the inference that Hillmon accompanied Walters on the trip is almost as strong, if not as strong, as the inference that Walters in fact went on the trip. Although this is not always true, it can be said with confidence that in many situations the trustworthy nature of the inference to be be drawn with regard to the person named is compelling, and that the result of the proposed limitation will often be to exclude reliable evidence for plainly insufficient reasons.

A curious aspect of the rule adopted in the House Committee Report and advocated in the Commentary to the Proposed New York Code of Evidence, and one that I have not seen discussed elsewhere, is that it permits introduction of statements of intent as a basis for inferences with regard to another person under circumstances that have less probative value than those statements which it excludes, or the inferences from which it limits.

Assume, for example, that in the immediate case the deceased had told a witness that it was important for her to meet the defendant and that she was going to do so, and that she was thereafter found dead under circumstances pointing to the defendant as the killer, of comparable probative value to those presented here. Such a statement, as I understand it, would present no hearsay issue even though it were offered as evidence that the deceased may have met defendant at a

relevant time, since the statement does not include directly or by implication anything of a hearsay character relating to the defendant's actions or state of mind. The single question presented would be the normal one raised by any offer of circumstantial evidence—its relevance to an issue in the case. And although the inference to be drawn from the statement would be attended by several contingencies of a doubtful kind, it would seem to me clear that such a statement would in fact be admissible as relevant in a case in which independent evidence of a significantly probative value pointed to the defendant as the killer.

Such a statement would at least have as much probative value as would testimony by a witness that he had seen the defendant at a relevant time in the neighborhood of the deceased's apartment building, testimony that would surely be admitted under the circumstances presented here even though considered by itself, and without regard to other circumstances, it would have no value and would depend upon an inference as to the defendant's state of mind.

Or consider that in the instant case the deceased had told the witness that she was going to call the defendant and ask him to come over to her apartment. A statement of this kind likewise would have presented no hearsay problem of the kind alleged to be presented by the statement with which we are concerned. The single issue would have been the circumstantial one of whether her intent to call the defendant to come over should be considered by the jury together with the other evidence in the case, and I have little doubt that an application of the normal principles of relevancy would have supported its admission.

What is striking about these illustrations is that they present no hearsay problems with regard to statements of intent offered as a basis for drawing an inference as to a defendant's action although the probative value of the statements is clearly significantly less than the value of the statements of the kind presented in *Hillmon* (145 US 285, *supra), Malizia* (92 AD2d 154, *supra),* and in this case, statements alleged to be inadmissible as violative of the hearsay rule. It is surely permitted to doubt the correctness of a rule that yields such anomalous and apparently unrealistic results.

In approaching the central issue presented here, I would think that analysis should start with the lesson of ordinary human experience that people do not usually say that they

are going to meet another unless they have reason to believe that such a meeting will in fact take place. No doubt there are circumstances in which a declarant may have formed his intention on the basis of inaccurate or unreliable information or because of a misunderstanding, and for these reasons it is important for the trial court to be satisfied that the statement was serious in character and made under circumstances persuasive as to its trustworthiness. Where the circumstances surrounding the statement meet those criteria, it would seem to me that the reason for admitting such testimony and its probative value is unmistakably clear in the kind of situation with which we are concerned, and that juries may be trusted to evaluate the evidence in a way that will present no significant problem of unfairness to a defendant.

The rule that follows from the above analysis, the one set forth in *Hillmon (supra)* and in a host of cases since *Hillmon,* seems to me this: If a statement of intent by the deceased declarant is made under circumstances which justify its admissibility as evidence that he did what he said he would do, the fact that his intention was influenced by or based on information or facts that would, by themselves, have been excludable as hearsay, should not deny the jury the right to consider the evidence or artificially limit the jury in the inferences that they might derive from the evidence when considered together with all of the evidence in the case.

In Professor Maguire's article, he refers to notes on evidence by Dean Thayer, himself a distinguished authority in the area of evidence, who was secretary to the author of the *Hillmon* opinion at the time the opinion was written. Dean Thayer concluded with regard to the *Hillmon* doctrine " 'that some broad and simple rule like this is really necessary.' " (38 Harv L Rev 712.) Notwithstanding the scholarly criticisms which have been leveled at the *Hillmon* doctrine, I believe that this view, which has been accepted by numerous courts in a broad range of circumstances, reflects a response to the situation presented that makes sense in accordance with the lessons of human experience.

Accordingly, the judgment of the Supreme Court, New York County (Joan B. Carey, J.), rendered May 3, 1984, convicting defendant of three counts of murder in the second degree, one count each of robbery in the first degree and burglary in the second degree, and sentencing him to three terms of imprisonment of from 15 years to life on the murder counts to run concurrently with each other, and with concurrent sentences

of 5 to 15 years on the robbery and burglary counts, should be affirmed.

SULLIVAN and KASSAL, JJ., concur with CARRO, J; SANDLER, J. P., and WALLACH, J., dissent in an opinion by SANDLER, J. P.

Judgment, Supreme Court, New York County, rendered on May 3, 1984, reversed, on the law, and the matter remanded for a new trial.