THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EDWARD JACKSON, Appellant. [814 NYS2d 627]—

Judgment, Supreme Court, Bronx County (John S. Moore, J.), rendered October 29, 2003, convicting defendant, after a jury trial, of three counts of rape in the second degree, and sentencing him, as a second felony offender, to concurrent prison terms of 3½ to 7 years on each conviction, modified, on the law, to the extent of vacating the provisions for sex offender registration and DNA databank fees, and otherwise affirmed.

At defendant's rape trial, the court correctly admitted evidence of a prior uncharged crime in which defendant allegedly raped the family's 19-year-old babysitter. The court allowed it as background for a statement defendant allegedly made during that earlier incident to the effect that if the babysitter were not

there, it would have been the 14-year-old complainant (i.e., "He told me that [complainant] was lucky I was there, because if I wasn't there, it would be her").

Turning first to the meaning of defendant's statement, our dissenting colleague states that it "requires a perversion of the English language to describe [defendant's] words as a statement of future intent, future threat or future inclination," reasoning that "[t]he statement in issue refers patently to the here and now, to the situation that the defendant and [the babysitter] found themselves in on the night the statement was made." We disagree. Rather, we find the statement is unquestionably a reflection of defendant's overall general intent, including his future intent. Defendant's statement is probative of his intent for the future despite the particular language he used to hedge his then present thoughts expressing that abundantly clear intent. The obvious interpretation is that defendant meant that, but for the present victim, he would instead be having sex with the 14-year-old complainant. Put another way, defendant's statement is a threat or a manifestation of his intent to carry out an injurious action against a particular victim in identical circumstances. Surely, jurors are empowered to interpret a defendant's statement in a reasonable way, rather than to blindly accept a statement at face value without considering context and other circumstances (see People v Smith, 79 NY2d 309, 315 [1992]).

At the pretrial hearing, the court correctly concluded that defendant's statement was more than merely relevant, but "key" to the People's case and that it was admissible. The statement was properly admitted as circumstantial evidence that defendant intended to take a particular course of action and that defendant did in fact take that particular course of action (see Stokes v People, 53 NY 164, 174-175 [1873]; People v Bierenbaum, 301 AD2d 119, 150 [2002], lv denied 99 NY2d 626 [2003], cert denied 540 US 821 [2003]). As observed by the Court of Appeals over a century ago (Stokes, 53 NY at 175): "Threats to commit the crime for which a person is upon trial are constantly received as evidence against him, as circumstances proper to be considered in determining the question whether he has, in fact, committed the crime, for the reason that the threats indicate an intent to do it, and the existence of this intention creates a probability that he has in fact committed it." Thus, defendant's statement was properly admitted as indicative of his future intent to harm this particular complainant. Indeed, this Court has also allowed this type of testimony even when the defendant killed the victim and a third person related the victim's earlier statement expressing defendant's intention to harm or

kill the very same victim (*see Bierenbaum*, 301 AD2d at 150; *People v Bonilla*, 251 AD2d 82 [1998], *lv denied* 92 NY2d 893 [1998]; *People v LaFrance*, 182 AD2d 598 [1992], *lv denied* 80 NY2d 905 [1992]). Here, the witness testified firsthand to a statement defendant made directly to her. Therefore, under clearly established principles, his statement was properly admitted.

Defendant's statement was properly admitted for the additional reason that it was important "background evidence" serving "to complete the narrative." Specifically, complainant reported to the babysitter that defendant sexually assaulted her. As the prosecutor argued, the babysitter's testimony both about defendant's acts against her and his statement to her concerning the complainant was "necessary to complete the narrative as to why no one was told." We note as well that the complainant also testified that before she first was attacked by defendant, he woke her up one morning and discovered she had allowed a boy who had been "kicked out" of his own home to sleep in her room. When defendant told her the boy had to leave, she begged defendant not to tell her mother. He replied that her mother was on the phone. Afraid defendant would tell her mother, the complainant herself told her mother about the boy.

As the complainant herself testified without objection, one reason she did not tell her mother about defendant's sexual assault was, "I didn't think my mother was going to believe me, 'cause I just finished getting in trouble . . . " (because she allowed the boy to sleep in her room). Accordingly, absent the babysitter's testimony, the prosecution would have been unfairly deprived of a basis for answering the charge—which indeed defense counsel suggested on summation—that the complainant had fabricated defendant's sexual assault in retaliation for defendant having gotten her into trouble with her mother over the boy she had allowed in her room.

Alternatively, defendant's statement is an admission and, therefore, properly received into evidence* (*see* Prince, Richardson on Evidence § 8-201 [Farrell 11th ed] [generally, "any decla-

---

* We need not address the People's contention that defendant's statement was properly received pursuant to *Mutual Life Ins. Co. v Hillmon* (145 US 285 [1892]), as we find the statement otherwise acceptable into evidence as an admission. In any event, we would agree that *Hillmon* affords additional support for the admissibility of defendant's statement as it is clearly probative of his future intent, his state of mind, his motive, and his future threat against this complainant (*see also United States v Pheaster*, 544 F2d 353, 376 [9th Cir 1976], *cert denied sub nom. Inciso v United States*, 429 US 1099 [1977]). While we agree with our dissenting colleague that the *Hillmon* rule of evidence is typically invoked to prove that a declarant carried out an intention to meet

ration or conduct of a party which is inconsistent with the party's position on trial may be given in evidence against the party as an admission"]; *see e.g. People v Burke*, 96 AD2d 971 [1983], *affd* 62 NY2d 860 [1984]). In *People v Burke*, the witness testified that about two weeks after the fire defendant was charged with setting, he asked defendant whether defendant had covered his tracks. Defendant replied, "yes, there was nothing to worry about, he had left nothing behind, no one could find anything" (*id.* at 971). The Appellate Division found defendant's statements "certainly probative of [his] guilt" and admissible as circumstantial evidence (*id.* at 972).

Accordingly, the trial court properly admitted, through the babysitter's testimony, defendant's statement. Concomitantly, the court also properly admitted the babysitter's testimony regarding the related uncharged crime. Defendant maintains that the court improperly admitted this testimony in violation of state evidentiary principles. Defendant, for the first time on appeal, also argues that the admission of this testimony violated his federal constitutional right to a fair trial. However, his federal constitutional objection was not preserved at the trial level. In any event, defendant was not deprived of his rights to a fair trial. It is beyond cavil that evidence of an uncharged crime is inadmissible if the sole purpose is to demonstrate propensity (*see People v Blair*, 90 NY2d 1003, 1004-1005 [1997]; *People v Ventimiglia*, 52 NY2d 350, 359 [1981]; *People v Allweiss*, 48 NY2d 40, 46 [1979]). However, evidence of an uncharged crime is admissible if linked to a specific material issue or fact relating to the crime charged and if its probative value outweighs any prejudicial impact (*see People v Hudy*, 73 NY2d 40, 54-55 [1988]; *People v Alvino*, 71 NY2d 233, 241-242 [1987]; *People v Walker*, 265 AD2d 254, 255 [1999], *lv denied* 94 NY2d 908 [2000]).

The threshold inquiry in identifying a specific issue other than propensity is a question of law, while the balancing of prejudicial impact and probative value is discretionary (*see Hudy*, 73 NY2d at 55). Here, we find that the trial court did not err in allowing the babysitter to testify about the uncharged crime, where that act was inextricably interwoven with the statement—a statement which the court had properly determined was "key" to the People's case and admissible—and where presentation of the statement outside the context of the act would have rendered it meaningless to the jury (*see People v Feliciano*, 301 AD2d 480 [2003], *lv denied* 100 NY2d 538 [2003]). Nor did

---

with someone, we part company with his reasoning by observing that *Hillmon* does not limit its rationale only to that fact pattern.

the court improvidently exercise its discretion in determining that its probative value outweighed any prejudicial impact.

Defendant also argues that the babysitter's testimony about the alleged uncharged crime was inadmissible to prove intent regarding the charged crimes because intent may be inferred from the crime itself (*see e.g. People v Vargas*, 88 NY2d 856, 858 [1996]; *People v Hudy, supra*). Here, however, the prior uncharged crime was not admitted to demonstrate that defendant's conduct toward the complainant was an intentional act, but to place into context defendant's properly admitted statement about his future intent.

The court, throughout the trial, took great pains to insure that any potential prejudice to defendant was minimized. In its pretrial ruling, the court placed limits on the scope of the babysitter's testimony instructing the People to "keep this to a minimum in terms of this witness' testimony." The court reiterated in its pretrial ruling that the People were not to conduct a "lengthy direct examination" of the babysitter and to keep her testimony "as brief as possible." The court also denied the People's request to allow the babysitter to testify to a second similar incident involving defendant and her. In addition to these limitations, the court specifically instructed the jury on two separate occasions regarding the babysitter's testimony. The court first instructed the jury, contemporaneous with the babysitter's testimony, that her testimony concerning the "sexual activity" between the defendant and her was not admitted as proof of propensity or disposition to commit the crimes charged in the indictment, but rather was admitted as background evidence to provide a context for the statement and to complete the narrative. In addition, the court instructed the jury that the People offered the babysitter's testimony for the purpose of establishing defendant's motive, state of mind, and future intent. The court further instructed the jurors that it was up to them to determine whether the statement was in fact made by the defendant. If they found that defendant had not made the statement, they were instructed to ignore it. If they found that defendant had made the statement, they were instructed that they "may" consider the statement together with the other evidence in the case. Finally, the court instructed the jury that such evidence may be considered only for this limited purpose and no other. In its charge to the jury at the end of the case, the court gave a similar instruction regarding the babysitter's testimony. The court's limitation of the babysitter's testimony together with its instructions to the jury on two separate occasions regarding the limited purpose of her

testimony obviated any undue prejudice to defendant (*see People v Berry*, 267 AD2d 102 [1999], *lv denied* 95 NY2d 793 [2000]; *People v Walker, supra; People v Bonilla, supra*).

Defendant's reliance on *People v Resek* (3 NY3d 385 [2004]) is misplaced. There, to fill the gap in the narrative, the trial court allowed testimony of an uncharged crime involving a stolen car during the defendant's trial for criminal possession of a controlled substance with intent to sell. Specifically, the police officer testified that the police had monitored the car defendant was driving based on a report it was stolen. The defendant was accused of drug possession with intent to sell based on the search of the car he was driving. Although the grand jury had specifically refused to indict the defendant for possession of a stolen car, the court erroneously instructed the jury that "it is not in any way to be inferred by you that the defendant did or did not steal the car or anything of the kind" (*id.* at 388). Here, the grand jury did not decline to charge defendant in connection with his alleged sexual assault of the babysitter, the babysitter's testimony was limited in scope, and the court delivered detailed and proper limiting instructions to the jury on two occasions, one during her testimony, and one after summations. Furthermore, here, unlike *Resek*, the uncharged crime was essential to explain the babysitter's comment about defendant's future intent and to place it in its proper context.

As the People concede, since defendant committed the instant crime prior to the effective date of Penal Law § 60.35 which provides for the imposition of sex offender registration and DNA databank fees, defendant's sentence is unlawful to the extent indicated (*see People v Febres*, 11 AD3d 319 [2004]). Concur—Marlow, J.P., and Williams, J.

McGuire, J., concurs in a separate memorandum as follows: Although I agree with the crux of the majority's analysis, I write separately to underscore that the admissibility of the statement defendant made to the babysitter does not depend in the slightest on whether it falls within the *Hillmon* doctrine (*see Mutual Life Ins. Co. v Hillmon*, 145 US 285 [1892]). It unquestionably is an admission, and thus its admissibility does not turn on whether it passes muster under another, independent exception to the hearsay rule. If the prosecution offered evidence in a murder case that the defendant approached a police officer in a state of great agitation and exclaimed that he had just shot his spouse, his statement to that effect would be admissible regardless of whether the prosecution also could show it was an "excited utterance" or that the attendant circumstances established its reliability.

With respect to the *Hillmon* doctrine, however, I understand the People's position (both at trial and on appeal) to be simply that it affords additional support for admitting the statement into evidence. For the reasons stated by the majority, I agree with the People's position. Moreover, as the majority correctly observes, *People v Smith* (79 NY2d 309, 315 [1992]) makes clear that no principle of law requires that defendant's statement be accepted at face value or not at all.

Nor does common sense. To illustrate, suppose that in a murder case the prosecution proposed to call a witness to testify that a month before the alleged murder the defendant said the following: "I'm so mad at [the victim] right now, I would like to kill him." Surely the statement would be admissible despite being couched in the "here and now." Alternatively, suppose the statement was, "If I thought I could get away with it, I would kill [the victim]." Surely the statement would not be inadmissible on the ground that it, to use the dissenter's expression, "reflects, if anything a forbearance or lack of intent towards the [victim]." In both hypotheticals, and in this case, the statements are probative of the speaker's intent despite the particular terms used to hedge his intent. Put differently, because intent can be manifested in unequivocal statements (e.g., "I am going to kill V," or "I am going to have sex with V"), it does not follow that less unequivocal statements are not probative of intent.

Viewed in a commonsense fashion, defendant's statement is highly probative of an intention to commit the very crime against the complainant with which he was charged and for which he was convicted. Although I agree that the statement fairly can be viewed as a "threat" to commit that crime, the point need not be debated. As the Court of Appeals made clear in *Stokes v People* (53 NY 164, 175 [1873]), a threat to commit a crime is admissible precisely because it is probative of the defendant's intent to commit the crime.

Of course, the statement's obvious legal status as an admission was not alone sufficient to justify admitting it into evidence. Rather, and as the trial court recognized, because the statement was inextricably linked with the uncharged criminal conduct by defendant, the trial court was required to determine whether its probative value outweighed the risk of undue prejudice to him (*see People v Till*, 87 NY2d 835, 836-837 [1995]). Our conclusion that the trial court did not improvidently exercise its discretion in determining to admit the statement and the contemporaneous conduct (*see People v Tosca*, 98 NY2d 660, 661 [2002]) is not undercut at all by the length of the

deliberations. If the jury had deliberated for just an hour, the dissent could maintain with equal logic that the shortness of the deliberations demonstrates the prejudice to defendant. The propriety of the court's discretionary determination is not and cannot be affected by such subsequent events.*

Catterson, J., dissents in a memorandum as follows: I dissent because the trial court improperly admitted an out-of-court statement allegedly made by the defendant about the complainant. The admission of that statement was based on misinterpretation of the *Hillmon* doctrine. Furthermore, the court compounded its error by permitting testimony about uncharged acts allegedly committed by the defendant so that jurors could "make sense" of the inadmissible statement. The conviction of the defendant Edward Jackson on three counts of second-degree rape should therefore be vacated by this Court and the matter remanded for a new trial.

In January 2002, the complainant (hereinafter referred to as MB) lived with her mother, two younger brothers aged 10 years and five months, and an 18-year-old babysitter, Crystal G., in a four-bedroom apartment. After the defendant, a family friend, was evicted from his home he was given a key to the apartment by MB's mother and was allowed to sleep in the mother's room while she worked nights as a security guard. MB accused the defendant of raping her on three occasions in February and March 2002, three months before her fifteenth birthday, and a few weeks after the defendant allegedly engaged in nonconsensual sex with the babysitter, Crystal G.

Crystal G. testified at a *Molineux* hearing and at trial that in January 2002, while she was sleeping in MB's room with her charge, MB's five-month-old brother, the defendant came in and told her he could not sleep on the couch because he had hurt his

---

* Drawing conclusions about the strength of the People's case from the length of the jury's deliberations and its notes is perilous in any event. Here, the jury deliberated for a little more than four full days, and deliberations repeatedly were interrupted by lengthy read-backs of testimony in response to the jury's requests. At no point, moreover, did the jury ask the court to explain its instructions on the law. For all that appears in the record, it may be that the jury struggled with the first-degree (forcible) rape charges for four days, and quickly reached a verdict on the second-degree rape charges after eventually determining the People had not proven the forcible rape charges beyond a reasonable doubt. Whatever else might fairly be gleaned from the record, the jury's discriminating verdict suggests it followed the court's limiting instructions and was not overwhelmed by the uncharged crime evidence (*see People v Till*, 87 NY2d at 837 [upholding admission of uncharged crime evidence and noting that "the jury rendered a discerning and discrete verdict finding defendant guilty only on the illegal weapons possession count and acquitting him on the others"]).

back. Crystal G. testified that she "moved over closer to the baby, which is closer to the wall and I just laid back down" and the defendant got into bed with her.

According to Crystal G., the defendant then proceeded to engage in sexual intercourse with her against her will.[1] At the hearing and subsequently at trial, Crystal G. testified that she asked the defendant to stop. Allegedly, the defendant then made the statement in issue. Crystal G. testified: "He told me that [MB] was lucky I was there, because if I wasn't there, it would be her."

Crystal G. further testified that she felt that MB was in a "little danger" but she figured "if I continued to let him do it, he would leave her alone." She claimed she had sex with the defendant "to protect MB." Allegedly, a couple of days later, the defendant had nonconsensual sex with Crystal G. again, but this time he did not mention MB.

At trial, MB testified that the defendant raped her three times between February 14 and March 12, 2002. She described circumstances that were almost identical to the circumstances described by Crystal G.[2] MB further testified that initially, after telling Crystal G. what the defendant did to her, she did not want to tell her mother about the incidents because she felt that her mother would not believe her; and that her mother would suspect she was attempting to retaliate against the defendant for an incident where the defendant discovered an 18-year-old boy had spent the night in MB's bedroom.

At trial, the court instructed the jury that the statement allegedly made by the defendant to Crystal G. about MB was not a future threat, but was "more like amorous design since it showed appellant was purportedly attracted to the complainant." The trial court ruled the statement was "key" because it showed "motive, state of mind and future intent." After deliberating for five days and requesting a number of readbacks, the jury acquitted the defendant of three counts of forcible rape and convicted him of statutory rape.

The defendant appeals his conviction on the grounds that the trial court erred in admitting his alleged statement to Crystal G. and her testimony about the incidents of alleged nonconsensual sex. The prosecution asserts on appeal, and contrary to the rationale of the trial court, that "the chief purpose [of introduc-

---

**1.** In allowing Crystal G. to testify to this uncharged act, the trial court observed that: "She is not going to call it rape, and she didn't call it rape. She calls it sex against her will."

**2.** MB testified that the defendant came into her room and complained that his back bothered him, and that he did not want to sleep on the couch.

ing the statement] was to demonstrate defendant's state of mind under the *Hillmon* doctrine." The prosecution further contends that statement was properly admitted under *Hillmon*'s "particular species of the state of mind exception" as inferential proof that the defendant carried out his intention to rape MB.

The prosecution's assertions are based on a complete misreading of the *Hillmon* doctrine. In *Mutual Life Ins. Co. v Hillmon* (145 US 285 [1892]), an action brought to recover on an insurance policy, the Supreme Court held that the trial court erroneously excluded letters of the deceased as inadmissible hearsay. In the letters, the decedent had informed members of his family that he was traveling to a particular location with a man named Hillmon. The Court held that the statement could be properly admitted as an exception to the hearsay rule, and further that the letters tended to corroborate the evidence that, *the man had, in fact, made the journey*. (*Hillmon*, 145 US at 294-295.)

More recently, the Ninth Circuit elaborated on the *Hillmon* doctrine as a state of mind exception that "provides that when the performance of a particular act by an individual is an issue in a case, his intention (state of mind) to perform that act may be shown. From that intention, the trier of fact may draw the inference that the person carried out his intention and performed the act." (*United States v Pheaster*, 544 F2d 353, 376 [1976], *cert denied sub nom. Inciso v United States*, 429 US 1099 [1977].)

We relied on *Pheaster* to become the first New York court to uphold admissibility of a statement under the *Hillmon* doctrine in *People v Malizia* (92 AD2d 154 [1983], *affd* 62 NY2d 755 [1984]). It is now generally accepted that "under appropriate circumstances a declarant's statement of intent to perform an act may be admissible as evidence that he performed the act." (*Id.* at 159.)

The prosecution, however, fails to recognize that the *Hillmon* exception operates within very narrow, strict confines: the out-of-court declarant is *never* the defendant and is generally unavailable because he/she is deceased, usually as the victim of the charged crime. Further, in virtually every reported case involving the *Hillmon* exception, the act in issue involves *a meeting* between the declarant and a third party. Indeed, in *People v Chambers* (125 AD2d 88 [1987], *appeal dismissed* 70 NY2d 694 [1987]), one of the decisions specifically cited by the prosecution, we clearly observed that the type of statement sought to be admitted under the *Hillmon* doctrine "typically involves a highly prejudicial statement by the *declarant-deceased* that he intended to meet the defendant at a particular place and is of-

fered to prove circumstantially that defendant and the declarant did meet and that defendant had the opportunity to kill the declarant." (*People v Chambers*, 125 AD2d at 91 [emphasis added]; *see also People v Malizia, supra* [statement made by deceased to his brother that he was going to meet the defendant was admissible]; *People v Maddaloni*, 214 AD2d 325 [1st Dept 1995], *lv denied* 86 NY2d 737 [1995] [deceased's statement to his wife made immediately after phone call from defendant was admissible under the state of mind exception to the hearsay rule involving a deceased victim's declaration of future intent to meet the defendant].) The Second Department has a similar understanding of *Hillmon*. (*See People v Bongarzone*, 116 AD2d 164 [1986], *affd* 69 NY2d 892 [1987] [admitting statement in a situation that "commonly presents" itself where the declarant states his intention to meet—or as here to place a telephone call—to a third person].)

In our holdings, we painstakingly detailed our reasons for admitting such statements. In *Malizia*, we concluded that "a statement by a deceased that he intends to meet another is admissible . . . [because] [e]veryday experience confirms that people frequently express an intent to see another under circumstances that make it extremely likely that such a meeting will occur." (*People v Malizia*, 92 AD2d at 160.)

At the outset then, the instant case is easily and obviously distinguishable because the declarant is the defendant, and so is not deceased. Nor does the alleged statement refer to any intent to meet with a third party. Moreover, while the common law has expanded the doctrine to allow inferential proof that an act was performed by a defendant, this only occurs when the defendant is the third party referred to in the statement of intent made by the deceased-declarant, and when the statement is admissible as corroborative evidence tending to establish that the deceased met the defendant. (*People v Chambers*, 125 AD2d at 91 [hearsay statement is circumstantial proof that the act did occur, and by necessary implication, that the other person participated in the act].) In virtually every case in which the *Hillmon* issue has arisen, the declarant is unavailable because he or she was the victim of the charged crime. (Glen Weissenberger, *Hearsay Puzzles: An Essay on Federal Evidence Rule 803[3]*, 64 Temp L Rev 145 [1991].)

Again, the declarant in the case at bar clearly does not fall into this category. Here, the statement was made by the defendant himself and his unavailability arose as a result of his decision not to take the stand, and not because he had disappeared under suspicious circumstances.

In any event, even if we were to choose to expand the narrow class of *Hillmon* doctrine declarants, the defendant's statement still fails the rigid test we enunciated in *Malizia*. There, we decided on the test after examining the rationale for upholding admissibility of statements of future intent within the above-mentioned narrow confines. We found them admissible due to their "probative trustworthiness." (*People v Malizia*, 92 AD2d at 161.)

The Court of Appeals, in a case of first impression, reiterated the rationale for the *Hillmon* hearsay exception when it observed that the factors enunciated for admissibility of those statements are the same factors that are used for "justifying most common-law hearsay exceptions, [that is], a circumstantial probability of trustworthiness, and a necessity, for the evidence because of the unavailability of the declarant." (*People v James*, 93 NY2d 620, 629 [1999] [citation and internal quotation marks omitted], quoting *Mutual Life Ins. Co. v Hillmon*, 145 US at 295 [trustworthiness was bolstered because the letters were written at the very time and under circumstances precluding a suspicion of misrepresentation]; *see also People v Chambers*, 125 AD2d at 93 [the reasons for admitting such statements are that they are often expressed under circumstances "virtually assuring their verity"]; *Hunter v State*, 11 Vroom [40 NJL] 495, 534, 536, 538 [1878] ["he who uttered (such declarations) was bent on no expedition of mischief or wrong"].)

For this reason, we set very exacting standards in *Malizia* as to the admissibility of such statements. We held that out-of-court statements of intent to perform future acts are admissible only where (a) the statement is made under circumstances that make it probable that the expressed intent is a serious one, and (b) it is realistically likely that such event would take place. (*People v Malizia*, 92 AD2d at 160; *see also People v Chambers*, 125 AD2d at 95 [referring to the circumstances in *Hillmon* and *Hunter* where it was the "natural, nonsuspicious, business-like manners" in which the statements were made "which provided a solid and articulable basis for establishing for the reliability of those statements"].)

The circumstances in the instant case are the very antithesis of "nonsuspicious, business-like" circumstances that would give "verity" to the utterance. On the contrary, the circumstances as testified to by Crystal G. might more aptly be described as precisely the kind of situation where, to paraphrase *Hunter* (*supra*) the defendant was "bent on an expedition of mischief and wrong."

According to Crystal G., the statement was made by the de-

fendant after he had manipulated his way into her bed and was attempting to engage in consensual sexual intercourse with her. Nothing in the record contradicts the possibility that the defendant's words, if indeed he said them, were a type of manipulation to persuade Crystal G. to succumb to his advances.

Moreover, the second prong is not satisfied because the statement cannot be viewed as a statement of future intent, and therefore it becomes a logical and linguistic impossibility to determine whether it is "realistically likely that such event would take place."

According to the trial transcript, Crystal G. testified about the defendant's statement in the following words: "He told me that MB was lucky because if I was not there it would be her," but the record does not reveal the actual words allegedly spoken. Assuming arguendo that Crystal G. paraphrased them accurately, then the defendant, if speaking grammatically, may have said: "MB is lucky because if you weren't here, I'd be doing this to her" or in the prosecution's version: "MB is lucky because if you weren't here to rape, I'd be raping her."

Regardless of which version comes closest to the actual words allegedly spoken, it requires a perversion of the English language to describe those words as a statement of future intent, future threat or future inclination. The statement in issue refers patently to the here and now, to the situation that the defendant and Crystal G. found themselves in on the night the statement was made. The defendant, if indeed he made the statement, made it "in the moment" and there was no reference to any future act or future inclination on his part. It was expressed simply as a present thought.

Nor can the statement be viewed as a threat probative of motive, or even evidence of amorous design as the trial court deemed it to be. First, a threat implies the intent to carry out an injurious action. In the instant case, the defendant's alleged statement reflects, if anything, a forbearance or lack of intent towards the complainant. Second, the fact remains that contrary to any purported attraction to MB or amorous design, the defendant, in fact, got into bed with Crystal G., and stayed with Crystal G., and focused his attentions, unwanted though they may have been, totally on her. Moreover, days later he engaged in allegedly nonconsensual sex with Crystal G. again, this time with no mention of MB at all.

In *People v Chambers*, we reversed a trial court ruling that admitted an out-of-court statement because we held there was no evidence from which one could determine "if defendant had made a firm or tentative plan, whether he was hoaxing or even

threatening." We concluded that there was no way to "measure the seriousness of the intent." (125 AD2d at 95.) The circumstances and evidence of the instant case require that we do no less here.

The majority's reliance on *People v Bierenbaum* (301 AD2d 119, 150 [1st Dept 2002], *lv denied* 99 NY2d 626 [2003], *cert denied* 540 US 821 [2003]), is similarly unavailing. *Bierenbaum* involved a series of threats made by the defendant husband directly against the victim wife. There are no analogous statements in the instant case. Had the prosecution concerned the alleged rape of the babysitter rather than the 14-year-old complainant, *Bierenbaum* would have been relevant.

Significantly, while conceding that mens rea is not an issue, the prosecution maintains that without the statement "there would have been little motive in the jury's eyes for the defendant's sudden sexual assault on MB." In other words, rather than making the case for the testimony's probative value, the prosecution concedes it needs Crystal G.'s highly prejudicial testimony about the defendant's alleged statement to bolster the complainant's credibility.

Thus, ultimately, an inadmissible, highly prejudicial statement together with testimony that the trial court would not have allowed in if not for the statement tipped the balance in a case which was unquestionably a close call.[3] For the foregoing reasons, I believe the conviction should be vacated, and the case remanded for a new trial.

---

**3.** The jury deliberated for five days, asked for numerous read-backs, and acquitted the defendant of the forcible rape charges.